**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **BRIAN GREEN, et al.,**     ) | **CASE NO. 1:13-CV-00841** |
|     **Plaintiffs,**   ) | |
|     ) | **JUDGE TIMOTHY S. BLACK** |
| **v.**   ) | |
|     ) | |
| **BAKEMARK USA, LLC,  et al.,**   ) | |
|     ) | |
|     **Defendants.**   ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Natalie M. Stevens (0079963)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
127 Public Square
4130 Key Tower
Cleveland, OH  44114
Ph:     216.241.6100
Fax:    216.357.4733
Email:  natalie.stevens@ogletreedeakins.com


Kerri S. Reisdorff (*admitted Pro Hac Vice*)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4520 Main Street, Suite 400
Kansas City, MO 64111
Ph:     816.471.1301
Fax:    816.471.1303
Email:  kerri.reisdorff@ogletreedeakins.com


*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................................................1

II.   PROPOSED UNDISPUTED FACTS ("PUF") ......................................................2

     A.   Introduction .......................................................................................................2

     B.   Problems at the Fairfield Facility ....................................................................4

     C.   Green's Request and BakeMark's Approval of Job Protected Leave in
        September 2011 ...................................................................................................5

     D.   Green's Performance Issues .............................................................................6

     E.   Green's Requests and Approvals for FMLA Leave ........................................8

     F.   Green's Request and BakeMark's Approval of Accommodations for
        Green ...................................................................................................................9

     G.   Green's Request and BakeMark's Approval of Additional
        Accommodations ..............................................................................................11

     H.   Green's Return from Leave .............................................................................12

     I.   BakeMark's Accommodation of Job-Protected Leave from May 3, 2012
        until September 28, 2012 ..................................................................................14

     J.   Green's Misconduct Discovered in Litigation ..............................................17

III.  LAW & ARGUMENT ..............................................................................................19

     A.   Summary Judgment Standard ........................................................................19

     B.   Green Cannot Establish A *Prima Facie* Case For Disability
        Discrimination Under The ADA Or Ohio Law Because He Cannot
        Establish That He Is A Qualified Individual With A Disability; Cannot
        Establish That BakeMark Failed To Reasonably Accommodate Him;
        And Cannot Establish Individual Liability Under Ohio Law ......................19

        1.   Green's Burden Of Proof .....................................................................19

        2.   Green Is Not A Qualified Individual With A Disability ..................21

        3.   BakeMark Always Reasonably Accommodated Green ...................23

        4.   BakeMark's Decision Not To Give Green The Specific
            Accommodation He Sought For Thirty Days In February And
            March 2012 Did Not Violate The Law. .............................................25

5. To The Extent Green's Disability Discrimination Claim Relates To Conduct After May 2, 2012, It Fails As A Matter Of Law Because By His Own Admission, He Was Completely Incapacitated From Working Beginning May 2, 2012 And, Therefore, Cannot Establish He Was A Qualified Individual With A Disability Under The ADA Or Ohio Law After May 2, 2012..................................................................28

6. Green's Disability Discrimination Claim Insofar As It Is Asserted Under Ohio Law Against The Individual Defendants, Fails As A Matter Of Law Because There Is No Evidence That Gomez, Sparks, Waters, Weltzin, Or Witzel Engaged In Any Discriminatory Conduct ........................................................................................31

C. Green Cannot Establish A *Prima Facie* Case For A Hostile Work Environment Because He Cannot Establish That His Workplace Was Permeated With Discriminatory Intimidation, Ridicule, And Insult Or That Any Alleged Intimidation, Ridicule, Or Insult Was Because Of His Alleged Disability ....................................................................................32

1. Green's Burden Of Proof ...................................................................32

2. There Is No Evidence Green Was Subjected To An Unlawful Hostile Work Environment Because Of A Disability ...................................34

D. Green Cannot Establish A *Prima Facie* Case For FMLA Interference Because He Cannot Establish That Defendants Denied Him FMLA Benefits To Which He Was Entitled Or Interfered With The Exercise Of His FMLA Rights........................................................................................37

1. Green's Burden Of Proof ...................................................................37

2. BakeMark Did Not Deny Green FMLA Benefits Or Interfere With The Exercise Of His FMLA Rights ....................................................38

3. Green's FMLA Claim Fails Insofar As It Is Asserted Against The Individual Defendants Because Gomez, Sparks, Weltzin, And Witzel Did Not Exercise Sufficient Control Over Green's Leave And Employment Status And, Further, There Is No Evidence That Waters Denied Green FMLA Benefits To Which He Was Entitled Or Interfered With The Exercise Of His FMLA Rights ...............................39

E. Green Cannot Establish A *Prima Facie* Case For Retaliation Because He Cannot Establish A Causal "But For" Connection Between His Protected Activity And Any Adverse Action Under Ohio Law ...............................................41

1. Green's Burden Of Proof ...................................................................41

**F.** **There Is No Causal Connection Between Any Protected Activity And The Denial Of Green's Request To Work A Part-Time Schedule In February/March 2012 And/Or Green's Hours Following His Return To Work In Late March 2012** ........................................................**42**

    **1.** **There Is No Causal Connection Between Any Protected Activity And Green's Action Plan/Disciplinary Notices** ...............................**43**

**G.** **Green's Is Not Entitled To The Damages He Seeks**................................**46**

    **1.** **Green's Damages (If Any) Are Limited By His Admitted Misconduct For Which He Would Have Been Terminated** ........................**46**

    **2.** **Green Is Not Entitled To Punitive Damages Because He Cannot Establish That Defendants Acted With Malice** ...............................**48**

**IV.** **CONCLUSION** ...............................................................................................**49**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alsept v. Honda of America Mfg., Inc.*,
  S.D. Ohio No. 3:11-cv-395, 2013 U.S. Dist. LEXIS 77530 ............................................ 28, 37

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................................ 19

*Asp v. Ohio Medical Transportation, Inc.*,
  10th Dist. No. 98AP-1063, 1999 Ohio App. LEXIS 2991 ...................................... 48

*Brenneman v. MedCentral Health Sys.*,
  366 F.3d 412 (6th Cir. 2004) .......................................................................................... 23

*Burdett-Foster v. Blue Cross Blue Shield*,
  574 Fed. Appx. 672 (6th Cir. 2014) .......................................................................... 20, 22

*Butler v. Cooper Standard Auto., Inc.*,
  376 Fed. Appx. 487 (6th Cir. 2010) ............................................................................ 31

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................................ 19

*Cox-Frietch v. Ohio Bureau of Worker's Comp.*,
  S.D. Ohio No. 1:10-cv-323-HJW, 2012 U.S. Dist. LEXIS 19189 ...................... 45

*EEOC v. Ford Motor Co.*,
  782 F.3d 753 (6th Cir. 2015) ............................................................................... *passim*

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998) ........................................................................................................ 33

*Geary v. UC Health*,
  S.D. Ohio No. 1:13-cv-300, 2015 U.S. Dist. LEXIS 79903 .............................. 36, 37

*Genaro v. Central Transport, Inc.*,
  84 Ohio St.3d 293 (1999) ........................................................................................ 20, 31

*Grindstaff v. Sun Chem. Corp.*,
  S.D. Ohio No. 1:09-cv-450, 2010 U.S. Dist. LEXIS 123426 .................................. 39

*Hammercheck v. Coldwell Banker First Place Real Estate*,
  11th Dist. No. 2007-T-0024, 2007-Ohio-7127 ........................................................ 29

iv

*Hankins v. Gap, Inc.*,
    85 F.3d 797 (6th Cir. 1996) ...........................................................................21, 27

*Harris v. Circuit Court*,
    21 Fed. Appx. 431 (6th Cir. 2001) ............................................................................29

*Harris v. Forklift Systems, Inc.*,
    510 U.S. 17 (1993) ............................................................................33

*Harris v. Metro. Gov't of Nashville and Davidson County*,
    594 F.3d 476 (6th Cir. 2010) ............................................................................38

*Hopkins v. Canton City Bd. of Educ.*,
    477 Fed. Appx. 349 (6th Cir. 2012) ............................................................................31

(*Id.*) *Jones v. Sumser Retirement Village*,
    209 F.3d 851 (6th Cir. 2000) ........................................................................ *passim*

*Jaszczyszyn v. Advantage Health Physician Network*,
    504 Fed. Appx. 440 (6th Cir. 2012) ............................................................................39

*Kempter v. Michigan Bell Telephone Co.*,
    534 Fed. Appx. 487 (6th Cir. 2013) ...........................................................20, 22, 25

*Leeper v. Verizon Wireless*,
    S.D. Ohio No. 2:08-CV-0727, 2009 U.S. Dist. LEXIS 60585 ............................................30

*Lees v. Thermo Electron Corp.*,
    S.D. Ohio Case No. C2-06-984, 2008 U.S. Dist. LEXIS 86367 ...........................................47

*Love v. Elec Power Bd. of Chattanooga*,
    392 Fed. Appx. 405 (6th Cir. 2010) ............................................................................33

*Manigan v. Southwest Ohio Reg'l Transit Auth.*,
    385 Fed. Appx. 472 (6th Cir. 2010) ...........................................................22, 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................19

*Matthews v. Village Center Community Development District*,
    M.D. Fla. No. 5:05-cv-344, 2006 U.S. Dist. LEXIS 85906 ...................................................27

*Mayers v. Sedgwick Claims Mgmt. Servs.*,
    101 Fed. Appx. 591 (6th Cir. 2004) ............................................................................29

*Mayes v. City of Oak Park*,
    285 Fed. Appx. 261 ............................................................................20, 33

*McKennon v. Nashville Banner Publishing Co.*,
   513 U.S. 352 (1995)........................................................................47

*Millington v. Morrow County Bd. of Commissioners*,
   S.D. Ohio No. 2:06-cv-347, 2007 U.S. Dist. LEXIS 74348...............................39, 40

*Mueller v. J.P. Morgan Chase*,
   N.D. Ohio No. 1:05 CV 560, 2007 U.S. Dist. LEXIS 20828 ...........................39, 40

*Murphy v. Ohio State Univ.*,
   549 Fed. Appx. 315 (6th Cir. 2013)...........................................................45

*Myers v. Cuyahoga County*,
   182 Fed. Appx. 510 (6th Cir. 2006)......................................................19, 20, 22

*Nuritdinova v. Cincinnati Children's Hosp.*,
   S.D. Ohio No. 1:13-cv-888, 2015 U.S. Dist. LEXIS 73869................................36

*Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192 (1981) ...........................................................37

*Preston v. Murty*,
   32 Ohio St.3d 334 (1987).........................................................................48

*Putney v. Contract Building Components*,
   3rd Dist. No. 14-09-21, 2009-Ohio-6718 ...............................................41, 42, 44

*Rabb v. The School Board of Orange County Florida*,
   590 Fed. Appx. 849 (11th Cir. 2014)...........................................................26

*Reddy v. J.P. Morgan Chase Bank*,
   S.D. Ohio No. 2:09-cv-1152, 2010 U.S. Dist. LEXIS 89162.................................40

*Rice v. Certain Teed Corp.*,
   84 Ohio St.3d 417 (1999).........................................................................48

*San v. Scherer*,
   10th Dist. No. Nos. 97APE03-317, 97APE03-318, *1998 Ohio App. LEXIS 405*...................47

*Soletro v. Nat'l Fed'n of Indep. Bus.*,
   130 F.Supp.2d 906 (N.D. Ohio 2001)......................................................23, 24

*Sosby v. Miller Brewing Co.*,
   415 F.Supp.2d 809 (S.D. Ohio 2005) ....................................................42, 43, 44

*Sweet v. Abbott Foods, Inc.*,
   10th Dist. No. 04AP-1145, 2005-Ohio-6880.....................................................31

*Thompson v. Bd. of Educ.*,
  S.D. Ohio No. 3:12-cv-287, 2013 U.S. Dist. LEXIS 161175 .................................................35

*Thurman v Yellow Freight Systems, Inc.*,
  90 F.3d 1160 (6th Cir. 1996) ...........................................................................................47

*Trepka v. The Board of Education of the Cleveland City School District*,
  28 Fed. Appx. 455 (6th Cir. 2002)..............................................................................21, 27

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
  133 S.Ct. 2517 (2013).......................................................................................................42

*Waltherr-Willard v. Mariemont City Sch.*,
  601 Fed. Appx. 385, 2015 U.S. App. LEXIS 2323 (6th Cir.) ...........................................33, 37

*Walton v. Ford Motor Co.*,
  424 F.3d 481 (6th Cir. 2005) ............................................................................................38

*White v. Standard Ins. Co.*,
  6th Cir. No. 12-1287, 2013 U.S. App. LEXIS 13368 .................................................... *passim*

## Statutes

29 U.S.C. § 2611(2)(A)(i) ..................................................................................................38

29 U.S.C. § 2615(a)(1) ......................................................................................................38

42 U.S.C. § 12111(8) .........................................................................................................22

Americans with Disabilities Act ...................................................................................1, 21

Family and Medical Leave Act.................................................................8, 9, 25, 37, 38, 39

Mich. Comp. Laws § 750.539c ...........................................................................................46

Mich. Comp. Laws § 750.539d ...........................................................................................46

Mich. Comp. Laws § 750.539e ...........................................................................................47

Ohio Rev. Code § 4112 ................................................................................................ *passim*

Ohio Rev. Code § 4112.02 ...........................................................................................31, 41

Ohio Rev. Code § 4112.02(I) ............................................................................................41

Fair Labor Standards Act ..................................................................................................25

**Other Authorities**

29 C.F.R. § 541.602 ..................................................................................25

29 C.F.R. § 1630.2(o) ...............................................................................26

29 C.F.R.§1630.2(p)(2)..............................................................................26

29 CFR §1630.2(m)-(n) ..............................................................................22

Fed. R. Civ. P. 56(c) ..................................................................................19

## MEMORANDUM IN SUPPORT

## I. INTRODUCTION

On October 16, 2013, Plaintiffs Brian and Kathryn Green initiated this action against CSM Worldwide NV, BakeMark USA LLC, Steve Weltzin,[1] Mike Witzel,[2] Justin Waters,[3] Kenneth Sparks,[4] and Rosemarie Gomez,[5] asserting twelve claims: (1) disability discrimination under Ohio Rev. Code § 4112; (2) common law disability discrimination; (3) retaliation under Ohio Rev. Code § 4112; (4) common law retaliation; (5) negligent retention and supervision; (6) intentional infliction of emotional distress; (7) hostile work environment based upon alleged disability or perceived disability; (8) constructive discharge; (9) FMLA interference; (10) disability discrimination under the ADA; (11) loss of consortium; and (12) punitive damages.

Plaintiffs Brian and Kathryn Green subsequently voluntarily dismissed CSM Worldwide NV; the claims for common law disability discrimination (Count Two), common law retaliation (Count Four), and constructive discharge (Count Eight); and the disability discrimination claim under the ADA (Count Ten) insofar as it was asserted against the individual defendants, as there is no individual liability under the ADA. (12.11.2014, Doc. No. 8.) Plaintiffs also subsequently voluntarily dismissed the negligent retention and supervision claim (Count Five), the intentional infliction of emotional distress claim (Count Six), and Kathryn Green's loss of consortium claim (Count Eleven). (4.22.2015, Doc. No. 52.)

Thus, the claims currently before the court are Brian Green's claims for disability discrimination under the ADA against BakeMark and under Ohio Rev. Code § 4112 against

---

[1] Mr. Weltzin was the former General Manager of BakeMark's Fairfield facility.

[2] Mr. Witzel is the Regional Operations Manager.

[3] Mr. Waters is the Corporate Workers' Compensation Administrator.

[4] Mr. Sparks was the Vice President of Human Resources.

[5] Ms. Gomez was the Human Resources Director.

BakeMark and the individual defendants (Counts One and Ten), retaliation under Ohio Rev. Code § 4112 (Count Three), hostile work environment (Count Seven), FMLA interference (Count Nine), and punitive damages (Count Twelve).  Defendants seek summary judgment in their favor as to each of these claims on grounds that Green cannot establish a *prima facie* case for any of them.  Moreover, even if he could, Defendants had legitimate, non-discriminatory and non-retaliatory reasons for all employment actions taken with regard to Green, which Green cannot establish were a pretext for unlawful discrimination or retaliation.  Furthermore, there is no evidence which would support a finding of punitive damages in this case and Green's damages are further limited pursuant to Defendants' after-acquired evidence defense due to misconduct by Green discovered in this lawsuit.

## II.    PROPOSED UNDISPUTED FACTS ("PUF")

### A.    Introduction

1.    On October 25, 2010, Green was hired by BakeMark as its Operations Manager at its Fairfield, Ohio facility.  (Ex. A: Brian Green Deposition ("Green Dep."), pp. 206-207[6]; Ex. B: Green Dep. Ex. 23, Offer Letter.)

2.    The Fairfield facility is one of BakeMark's regional distribution centers; as such, it serves as the warehousing and distribution center for BakeMark's high volume bakery ingredient products for bakery customers throughout the Ohio Valley region.  (Ex. A: Green Dep., p. 157-158; Ex. C: Steven Weltzin Deposition ("Weltzin Dep."), p. 21.)

3.    As the Operations Manager for the facility, Green was responsible for the overall management of the warehouse as well as BakeMark's transportation fleet. His duties included, but were not limited to: directing all warehouse and transportation operations and personnel to

---

[6]    In the interest of judicial efficiency, BakeMark has attached excerpts of lengthy exhibits. At the request of the Court, BakeMark will make the full exhibits available.

ensure timely customer deliveries, meeting planned budgets, and compliance with all BakeMark policies and procedures.  In a nutshell, Green was responsible for ensuring that customer orders were picked and loaded on trucks by warehouse personnel and delivered by BakeMark drivers in a timely and efficient manner.  (Ex. A: Green Dep., pp. 157-158, 211-216; Ex. D: Green Dep. Ex. 24, Operations Manager Job Description.)

4.　　Green had various reporting obligations. His direct supervisor was the General Manager of the Fairfield facility.  BakeMark's Vice President of Operations, Mark Phillips, also had ultimate authority over Operations for BakeMark.  (Ex. A: Green Dep., pp. 206, 222-223, 333.)

5.　　Green also received assistance and instruction from two senior Operations Managers, Chris Kapuska and Mike Witzel.  Eventually, in early 2012 Witzel was officially designated a Regional Operations Managers (having responsibility over the Fairfield facility). (Ex. A: Green Dep., pp. 223, 331-332; Ex. E: Michael Witzel Deposition ("Witzel Dep."), pp. 7-8-10, 15-16.)

6.　　As an exempt employee, Green did not have a set schedule or a set number of working hours. He understood that an essential requirement of his job was the ability to work as many hours (and at various times of the day and week) in order to get the job done.  Green specifically acknowledged that if he was permanently limited to working 8 hours a day, 5 days a week he would not be qualified for his position as Operations Managers routinely work more than forty hours a week and more than 8 hours a day to get the job done.  (Ex. A: Green Dep., pp. 207, 209, 420, 421, 422, 432; Ex. E: Witzel Dep., p. 12-13; Ex. Y: Green Dep. Ex. 45(L), March 16, 2012 E-mail with Doctor's Note.)

7.   Another essential function of the Operations Manager job was the ability to communicate verbally and effectively with management, including the General Manager.  (Ex. A: Green Dep., pp. 405-406.)

**B.      Problems at the Fairfield Facility**

8.      Throughout Green's employment, the Fairfield facility was not performing well. Indeed, Green was hired to replace the prior Operations Manager who was demoted for poor performance.  (Ex. A: Green Dep., pp. 204-205, 222, 230-232, 234-235, 299, 311.)

9.      Upon his hire, Green was tasked with significantly improving the overall operation of the warehouse and transportation functions.  (*Id.*, pp. 222, 283-284, 311.)

10.      Witzel assisted in the training of Green and made several visits to the facility in 2011 to assist Green and the facility and help ensure BakeMark's best practices were being implemented.  (*Id.*, pp. 331-335, 343-344; Ex. E: Witzel Dep., pp. 10, 15.)

11.      Given the poor performance of the facility, the General Manager was demoted to a sales position in the Spring of 2011.  (Ex. A: Green Dep., pp. 228-229, 233, 235.)

12.      In June 2011, Steve Weltzin was hired as the Fairfield General Manager.  Like Green, Weltzin was tasked with improving the overall performance of the facility.  (Ex. A: Green Dep., pp. 233, 235, 283-284; Ex. C: Weltzin Dep, p. 10.)

13.      In July 2011 an outside auditor inspected the warehouse operations at the Fairfield facility and issued a report finding multiple concerns and issues, including some serious issues. Given the seriousness of the audit results, the results were escalated to the senior leaders of the entire Company.  Green was advised and understood that the concerns needed to be immediately addressed.  (Ex. A: Green Dep., pp. 284-288, 302-303; Ex. F: Green Dep. Ex. 32, August 22-23, 2011 E-mail.)

14.    In addition, in August 2011 Weltzin counseled Green that he was running significantly over his budget, most notably in labor costs.  Both Green and Weltzin determined that labor costs needed to be reduced immediately (and Green acted accordingly).  Green described the Fairfield facility as being in "disarray" in August 2011.  (Ex. A: Green Dep., pp. 309-313; Ex. G: Green Dep. Ex. 33, August 8, 2011 E-mail.)

15.    In August 2011, Green's Warehouse Supervisor resigned during an investigation for misconduct reported by Green.  (Ex. A: Green Dep., pp. 326-330.)

**C.**   **Green's Request and BakeMark's Approval of Job Protected Leave in September 2011**

16.    In early September 2011, Green requested a leave of absence from September 22, 2011 to October 11, 2011 for surgery relating to a diagnosis of thyroid cancer.  (Ex. A: Green Dep., pp. 318-319, 321.)

17.    Weltzin approved Green's request for a job-protected leave of absence on September 8, 2011.[7]  (Ex. A: Green Dep., p. 319-320; Ex. H: Green Dep. Ex. 35, September 8, 2011 Personnel Action Notice; Ex. C: Weltzin Dep., p. 109; Ex.I: Justin Waters Deposition ("Waters Dep."), p. 43.)

18.    Green requested and Weltzin approved an extension to Green's leave until October 17, 2011.  (Ex. A: Green Dep., p. 321.)

19.    Green returned to work on October 18, 2011, with no restrictions from his doctor. (Ex. A: Green Dep., pp. 322-323; Ex. J: Green Dep. Ex. 36, October 10, 2011 Note from Dr. Fuentes.)

---

[7]    Green was not eligible for leave under BakeMark's Family Medical Leave Act (FMLA) policy because he had not worked for the Company for 12 months.  (Ex. A: Green Dep., p. 319; Ex. I: Waters Dep., p. 43.)

D.    **Green's Performance Issues**

20.    Given the criticalness of Green's position at the facility, BakeMark flew in Witzel (at that time a senior Operations Manager from Minnesota) to cover for Green during the first 2 weeks of his leave.  (Ex. A: Green Dep., pp. 333-334; Ex. K: Green Dep. Ex. 37, October 7, 2011 E-mail; Ex. C: Weltzin Dep., p. 93.)

21.    Witzel discovered that serious issues remained in the warehouse (referring to some as "glaring').  Witzel was particularly concerned that issues he identified for Green during his training had not been addressed and corrected by Green.   (Ex. A: Green Dep., pp. 333-335; Ex. K: Green Dep. Ex. 37, October 7, 2011 E-mail; Ex. E: Witzel Dep., pp.  15-16, 18-19.)

22.    Witzel reported his concerns to Phillips and it was decided to place Green on a formal action plan. Witzel then made both Weltzin and Green aware of his findings. Witzel told Green that he was "committed to help you in any way I can."   (Ex. A: Green Dep., p. 333-335; Ex. K: Green Dep. Ex. 37, October 7, 2011 E-mail; Ex. E: Witzel Dep., pp. 15-16.)

23.     Given these discoveries by Witzel – most notably the issues that Green had incorrectly represented to Wetlzin had been corrected and had been pointed out by Witzel months earlier – Weltzin issued Green a written counseling incorporating Witzel's action plan on October 17, 2011.    All of the expectations set forth in the action plan were consistent with Green's responsibilities and Green signed the document without comment.  (Ex. A: Green Dep., pp. 285, 288-289, 342-346; Ex. L: Green Dep. Ex. 39, October 17, 2011 Corrective Action; Ex. C: Weltzin Dep., pp. 61, 114-116; Ex. E: Witzel Dep., pp. 15-16; Ex. F – Green Dep. Ex. 32, August 22-23, 2011 E-mail.)

24.    During Green's leave, Rosemarie Gomez, BakeMark's Human Resources Manager located in California, received an unsolicited call from a Fairfield driver.   The driver reported that he was concerned that another hourly driver was instructing him to falsify

6

Department of Transportation (DOT) logs regarding number of hours on the road. (Ex. M: Rosemarie Gomez Deposition ("Gomez Dep."), pp. 8-9, 23-24.)

25.     In response, Phillips (BakeMark's Vice President of Operations) ordered an investigation into the complaint. (*Id.*, p. 24, 393-394; Ex. O - Green Dep. Ex. 52, November 1, 2011 E-mail.)

26.     The investigation involved the interview of drivers and the review of multiple DOT logs (sent by Green) by Philips and Gomez. During the investigation, Green admitted to Phillips that DOT violations were an "accepted practice" among the drivers at the Fairfield facility. It was also confirmed that Green gave an hourly driver the authority to supervise drivers during his leave of absence (ultimately resulting in the call to Human Resources). (Ex. A: Green Dep., pp. 373-377, 381; Ex. N: Green Dep. Ex. 51, October 27, 2011 Corrective Action; Ex. O: Green Dep. Ex. 52, November 1, 2011 E-mail; Ex. M: Gomez Dep., pp. 43-44.)

27.     Phillips issued Green a written counseling on October 27, 2011, based on the results of his investigation. Phillips was specifically concerned by Green's failure to address and correct the DOT issues in the previous 12 months. Green signed the counseling without comment. (Ex. A: Green Dep., pp. 376-377, 393-394; Ex. N: Green Dep. Ex. 51, October 27, 2011 Corrective Action; Ex. O: Green Dep. Ex. 52, November 1, 2011 E-mail.)

28.     Phillips also specifically cautioned Weltzin in writing that as General Manager he was also responsible for ensuring the facility complied with all applicable laws and failure to ensure such compliance would result in discipline. (Ex. A: Green Dep., p. 397-398; Ex. O: Green Dep. Ex. 52, November 1, 2011 E-mail.)

E.    **Green's Requests and Approvals for FMLA Leave**

29.    On November 25, 2011[8], Green requested a leave of absence thru January 2, 2012, for treatment related to an underactive thyroid.  (Ex. A: Green Dep., p. 367; Ex. P: Green Dep. Ex. 49, November 25, 2011 Dr. Fuentes Letter.)

30.    BakeMark timely approved Green's request and designated the leave as protected leave under its FMLA policy. BakeMake timely sent Green all of the required notices relating to his request and approval for FMLA leave.[9]  (Ex. A: Green Dep., p. 372; Ex. Q: Green Dep. Ex. 50, November 29, 2011 FMLA Letter: Ex. I: Waters Dep., pp. 77-78.)

31.    Green was not able to return to work on January 2, 2012.  On January 6, 2012, Green's doctor, Dr. Groth, stated that Green needed to be off work for "one month" (February 6, 2012) due to "medical issues." (Ex. A: Green Dep., pp. 408-409; Ex. S: Green Dep. Ex. 45(C), January 6, 2012 E-mail with Doctor's Note.)

32.    On January 27, 2012, Green emailed Weltzin and stated that he would not be able to return to work until March 15, 2012.  (Ex. A: Green Dep., p. 410, 413-414; Ex. T: Green Dep. Ex. 45(E), January 27, 2012 E-mail.)

33.    Relying on Green's representation, BakeMark approved Green's request for an extension to his FMLA leave thru February 19, 2012 (the date he exhausted his 12-weeks of FMLA leave).  BakeMark also sent Green a letter noting that the Company would need some additional information from Dr. Groth relating to Green's request to extend his leave following the expiration of his FMLA leave. (Ex. A: Green Dep., p. 413-414; Ex. U: Green Dep. Ex. 45(G), February 9, 2012 Waters Letter.)

---

[8]    Green testified that problems continued in the warehouse and Operations in October and November 2011.  (Ex. A: Green Dep., pp. 351-352.)

[9]    Green also specifically acknowledged his understanding of BakeMark's FMLA policy at the time of hire.  (Ex. A: Green Dep., pp. 221-222; Ex. R – Green Dep. Ex. 27, FMLA Acknowledgment Form.)

34.     Throughout Green's 12 weeks of FMLA leave, BakeMark held Green's Operations Manager position open. (Ex. A: Green Dep., p. 418-419.)

35.     As with his prior leave, BakeMark flew in Witzel and other out-of-state Operations Managers to cover Green's critical functions.  (Ex. A: Green Dep., pp. 400, 413-414; Ex. I: Waters Dep., p. 101; Ex. E: Witzel Dep., pp. 25-26.)

36.     This process required advanced planning on behalf of BakeMark and the Operations Managers which included purchasing plane tickets and making other travel arrangements and schedule planning.  (Ex. A: Green Dep., pp. 400, 413-414.)

37.     Justin Waters, BakeMark's Workers' Compensation Leave Administrator located in California, were responsible for responding to and approving Green's requests for FMLA. (Ex. I: Waters Dep., pp. 9-10, 15.)

**F.     Green's Request and BakeMark's Approval of Accommodations for Green**

38.     On Friday February 16, 2012, Green submitted a note from Dr. Groth stating that he could immediately return to work 4 hours a day, 5 days a week and that his restriction would be in place for 30 days.   (Ex. A: Green Dep., p. 415; Ex. V: Green Dep. Ex. 45(I), February 17, 2012 E-mail and attached Doctor's Note.)

39.     Prior to receiving this note, the last return to work date BakeMark had received was from Green stating that he could return on March 15, 2012. (Ex. A: Green Dep., p. 413-414; Ex. T: Green Dep. Ex. 45(E), January 27, 2012 E-mail.)

40.     BakeMark's Human Resources Department, led by Ken Sparks, Vice President of Human Resources and including Gomez and Waters (all located in California), met and considered Green's request, as well as other available reasonable accommodations, taking into

account Green's restrictions and BakeMark's business needs.[10]  (Ex. W: Kenneth Sparks Deposition ("Sparks Dep."), pp. 7-8, 25-26; Ex. I: Waters Dep., pp. 8, 11, 101; Ex. M: Gomez Dep., pp. 8-9, 59-63.)

41.     Ultimately, BakeMark decided to extend Green's job-protected leave for 30 days as an accommodation.  BakeMark's decision was based on the fact that Green could not perform the essential functions of his job working 4 hours a day, 5 days a week; and therefore, replacement managers would still be needed to cover for Green (thus, BakeMake would be paying for two managers to perform the job).  (Ex. A: Green Dep., pp. 417-419; Ex. X: Green Dep. Ex. 45(K), February 24, 2012 Waters Letter; Ex. I: Waters Dep., pp. 101; Ex. W: Sparks Dep., pp. 7, 26-27; Ex. M: Gomez Dep., pp. 61-63.)

42.     Throughout this extension to his leave, BakeMark held Green's position open for him, he continued to receive all benefits of employment (including health insurance and seniority), and he was eligible for and received disability benefits pursuant to BakeMark's short term disability (STD) plan.  (Ex. A: Green Dep., p. 417-419; Ex. X: Green Dep. Ex. 45(K), February 24, 2012 Waters Letter.)

43.     Throughout his leave from January thru March 2012, Green was unwilling to communicate verbally with his manager, an essential function of his job.  Both Weltzin and Waters made repeated requests that Green telephone Weltzin to discuss his requests (rather than send an email); Green never complied with those requests.  (Ex. A: Green Dep., pp. 404, 412-413, 419, 423-424.)

---

[10]   BakeMark also consulted legal counsel.  (Ex. I: Waters Dep., p. 45.)

**G.**    **Green's Request and BakeMark's Approval of Additional Accommodations**

44.    On March 16, 2012, Green sent BakeMark an email attaching a note from Dr. Groth.  Green's cover email stated that he was released "without restrictions". However, Dr. Groth's attached note stated that Green could only work 8 hours a day, 5 days a week.  There was no time limit stated for these restrictions.   (Ex. A: Green Dep., pp. 420-422; Ex. Y: Green Dep. Ex. 45(L), March 16, 2012 E-mail with Doctor's Note.)

45.     On March 19, 2012, BakeMark asked Green to obtain clarification from his doctor regarding whether he did, in fact, have restrictions and if so, whether the restrictions were permanent or temporary.  (Ex. A: Green Dep., p. 432-433; Ex. Z: Green Dep. Ex. 45(N), March 19, 2012 E-mail.)

46.    BakeMark agreed to accommodate the restrictions while Green was seeking clarification and told Green that they were excited to have him back.  (Ex. A: Green Dep., pp. 433, 438-439; Ex. AA: Green Dep. Ex. 45(T), March 21, 2012 E-mail; Ex. AB: Green Dep. Ex. 45(O), March 19, 2012 E-mail.)

47.    Green acknowledged that BakeMark's request was reasonable.   He also acknowledged that had the 8 hour a day, 5 day a week restriction noted by Dr. Groth been permanent he would not have been qualified for his Operations Manager position.  (Ex. A: Green Dep., p. 432.)

48.    Green was instructed to return to work on March 20 and 21, 2012.  Green did not report to work on either day.  BakeMark held Green's job for him. (Ex. A: Green Dep., pp. 433, 438-439; Ex. AA: Green Dep. Ex. 45(T), March 21, 2012 E-mail; Ex. AB; Green Dep. Ex. 45(O), March 19, 2012 E-mail.)

49.    Green was instructed to return to work on both March 22 and 23, 2012.  Green reported that he was unable to come to work on either day due to a medical issue.  BakeMark

11

held Green's job for him. (Ex. A: Green Dep., pp. 439-442; Ex. AC: Green Dep. Ex. 45(V), March 22, 2012 Weltzin E-mail.)

50.     On March 23, 2012, Green emailed a note from Dr. Groth which clarified his previous note stating that Green needed to be limited to 8 hours a day, 5 days a week until March 30, 2012. "Effective March 30, 2012, Mr. Green may return to work without restriction." (Ex. A: Green Dep., pp. 441-442; Ex. AC: Green Dep. Ex. 45(V), March 22, 2012 Weltzin E-mail.)

51.     BakeMark granted Green the accommodation requested in the note. (Ex. A: Green Dep., pp. 438-439; Ex. W: Sparks Dep., pp. 30-31; Ex. AA: Green Dep. Ex. 45(T), March 21, 2012 E-mail; Ex. AW: Sparks Dep. Ex. 158, March 26, 2012 E-mails.)

## H.     Green's Return from Leave

52.     Green worked as the Operations Manager from March 26, 2012 until May 3, 2012, when he went out on an approved leave. (Ex. A: Green Dep., pp. 443, 495, 508.)

53.     Green did not see any medical providers between March 26, 2012 and May 2, 2012. He also did not submit any medical notes to BakeMark during this time frame. (Ex. A: Green Dep., pp. 443-444.)

54.     The operations issues in the warehouse continued throughout the Spring. Indeed, Green testified that the shipping errors were getting worse in April of 2012. (Ex. A: Green Dep., pp. 454-455, 476-477; Ex. AI: Green Dep. Ex. 47, April 11, 2012 E-mail.)

55.     The warehouse also had the following unexpected setbacks[11]:

      a.     In late March 2012 a full-time warehouse employee resigned (Ex. A: Green Dep., p. 456.);

---

[11]   Prior to these events, the warehouse was generally operating with 9-10 full-time employees. (Ex. C: Weltzin Dep., pp. 21-22.)

      b.    In early April 2012 a full-time warehouse employee suffered an injury (broken ankle) taking him off work for three months (*Id.*, p. 455-456.); and

      c.    In mid-April 2012 another full-time warehouse employee suffered an injury (hernia) taking him off work for multiple months. (*Id.*)

56.    Each of these events, as well as the continuing problems in the warehouse, increased the workload of all warehouse employees, including management. (*Id.*, pp. 454-455.)

57.    In an effort to assist with these unexpected events and improve performance, BakeMark provided assistance to the facility and Green, which included the following:

      a.    Hired a Transportation Supervisor in February 2012.[12] (*Id.*, pp. 445-446, 451.)

      b.    Approved the hiring of a Warehouse Supervisor and recruited for the same[13] (the facility had not previously authorized the hiring of 2 supervisors in Operations) (Id., pp. 449-452; Ex. AH: Riley Employment Offer.); and

      c.    At BakeMark's expense, Witzel traveled to Fairfield and assisted in the warehouse on multiple days in April 2012; Witzel also offered himself and the other Regional Operations Manager as a resource for Green (*Id.*, p. 462-464, 471; Ex. AD: Green Dep. Ex. 46, April 5-8, 2012 E-mails.)

58.    Beginning on May 2, 2012, Green was at the facility for approximately 20 hours. Green testified to the following regarding that shift:

      a.    No one at BakeMark required or demanded him to work those hours;

      b.    Green determined that the hours were necessitated by critical business needs;

      c.    Green required his hourly warehouse workers to work 18-19 hours;

      d.    A vendor was hit by an overhead door in the warehouse causing an injury requiring medical treatment (this was an OSHA-recordable incident necessitating an investigation and paperwork); and

---

[12]  This position replaced the Warehouse Supervisor who resigned in August 2011 during an investigation for misconduct (reported by Green). (Ex. A: Green Dep., pp. 326, 330, 445).

[13]  A job offer was made on May 3, 2012. (Ex. A: Green Dep., p. 451; Ex. AH: Riley Employment Offer.)

      e.      At no time during the shift did Green reach out to Weltzin, Human Resources, or any other manager to request assistance or report that he was ill or needed to go home.

(Ex. A: Green Dep., pp. 495-497, 503, 505, 506; Ex. I: Waters Dep., pp. 157-159; Ex. C: Weltzin Dep., pp. 97-101.)

59.     Green secretly recorded (see below) the last conversation he had with Weltzin prior to leaving the facility on May 3, 2012.   At no time in this extended conversation does Green mention a medical condition or use any language that infers or alerts Weltzin to a potential medical concern.  (Ex. A: Green Dep., pp. 495-498, 501-505; Ex. AE: Green Dep. Ex. 48, May 2, 2012 Audio Recordings (last recording with Weltzin).)

60.     During this conversation Weltzin told Green to go home at 1:30 p.m. and return to assist on the night shift at 10:00 p.m. (as this was customary in his experience).  Green did not object or state that he was unable to return. (Ex. C: Weltzin Dep., pp. 97-101; Ex. AE: Green Dep. Ex. 48, May 2, 2012 Audio Recordings (last recording with Weltzin).)

## I.    BakeMark's Accommodation of Job-Protected Leave from May 3, 2012 until September 28, 2012

61.     Green did not report to work on the evening of May 3, 2012.  (Ex. A: Green Dep., p. 508; Ex. C: Weltzin Dep., p. 152-153.)

62.     On Friday May 4, 2012, Green submitted a note from Dr. Groth stating that Green could report to work on May 7, 2012, with a temporary restriction of working 8 hours a day, 5 days a week.  In response, BakeMark instructed Green to report to work on Monday May 7. (Ex. A: Green Dep., p. 508; Ex. C: Weltzin Dep., p. 153-155; Ex. AG: Weltzin Dep. Ex. 137, May 6, 2012 E-mail.)

63.     Green did not report to work on either May 7 or 8, 2012. (Ex. A: Green Dep., p. 508; Ex. C: Weltzin Dep., p. 153; Ex. I: Waters Dep., p. 156; Ex. AG: Weltzin Dep. Ex. 137, May 6, 2012 E-mail.)

64.     On May 9, 2012, Green submitted a note from Dr. Groth stating that Green could not work at all until he is able to evaluate Green's job duties and expectations.  (Ex. A: Green Dep., pp. 508.)

65.     Thereafter, BakeMark placed Green on approved job-protected leave of absence pending additional information from Dr. Groth.  Green did not have any FMLA available.  (Ex. I: Waters Dep., pp. 153-154; Ex. U: Green Dep. Ex. 45(G), February 9, 2012 Waters Letter.)

66.     BakeMark fully and timely cooperated with Dr. Groth's demands and requests; nonetheless, it took Dr. Groth until June 24, 2012 to provide BakeMark with representations regarding Green's restrictions and ability to work. Dr. Groth indicated that Green could return to work, albeit with daily and weekly hourly restrictions and physical restrictions for over 6 months.  (Ex. A: Green Dep., pp. 509-511; Ex. AJ: Green Dep. Ex. 57, June 24, 2012 Groth Letter; Ex. AK: Green Dep. Ex. 55, May 18, 2012 Waters Letter; Ex. AL: Green Dep. Ex 56, May 30, 2012 Waters Letter.)

67.     Unbeknownst to BakeMark (until discovery in this case), Dr. Groth – one week earlier and on Green's behalf – made materially different representations to Aetna, BakeMark's third party administrator of its STD plan.  To BakeMark, at that same time Dr. Groth stated that Green could work with restrictions and to Aetna (and in support of financial benefits for Green) Dr. Groth stated that Green was completely unable to work.  (Ex. A: Green Dep., pp. 511, 521-526; Ex. AJ: Green Dep. Ex. 57, June 24, 2012 Groth Letter; Ex. AM: Green Dep. Ex. 58, Attending Physician Statement; Ex. AF: Groth Business Records Affidavit.)

68.     Thereafter, and in reliance of Dr. Groth's representations in his June 23, 2012 letter, BakeMark requested a meeting with Green to engage in the interactive process and discuss his restrictions in relation to BakeMark's business needs.  (Ex. A: Green Dep., pp. 512-517.)

69.     Throughout July, Green repeatedly asserted that he could work under the restrictions outlined in Dr. Groth's letter but refused to come to the facility for a meeting or a conference call and refused to have any verbal conversation with the Company.  (*Id*., pp. 512-518.)

70.     Ultimately, in early August 2012 BakeMark and Green agreed to participate in a private mediation in early September to address the issue of whether Green's restrictions could be accommodated.   (Ex. W: Sparks Dep., p. 74)

71.     Based on the information provided by Green and Dr. Groth throughout the summer of 2012, BakeMark held Green's Operations Manager position open for five months. During that four month period BakeMark, at considerable expense, flew in out-of-state Operations Managers to cover the facility.  (*Id*., pp. 154-156, 517-520; Ex. AJ: Green Dep. Ex. 57, June 24, 2012 Groth Letter; Ex. I: Waters Dep., pp. 153-154; Ex. W: Sparks Dep., p. 74.)

72.      On September 10, 2012 (at the mediation), Green informed BakeMark for the first time that he was completely incapacitated from working for BakeMark and did not know when or if he would be able to return.  (Ex. A: Green Dep., pp. 151-152.)

73.     Thereafter, Green provided BakeMark with letters from two health care providers confirming that he was unable to work for BakeMark and that they did not know if or when he would ever be able to return.  (Ex. A: Green Dep., pp. 152-155; Ex. AN: Green Dep. Ex. 10, September 14, 2012 Allemang Letter; Ex. AO: Green Dep. Ex. 11, September 19, 2012 Groth Letter.)

74.     On September 28, 2012, BakeMark notified Green that they were unable to accommodate an indefinite leave of absence and terminated his employment.   (Ex. A: Green Dep., p. 156; Ex. AP: Green Dep. Ex. 12, September 25, 2012 Waters Letter.)

75. Green did not file an administrative charge with the EEOC (or a state agency) asserting that his termination violated the ADA, or that BakeMark failed to accommodate him in the summer of 2012. (Ex. A: Green Dep., pp. 114-115; 118; Ex. AQ: Green Dep. Ex. 8, EEOC Charges.)

76. In the Summer and Fall of 2012 Green applied for financial benefits under BakeMark's long-term disability (LTD) plan – which was administered by Aetna. Green asserted that he was entitled to the benefits because he was unable to work and based on those representations he was approved for significant financial benefits. Green received LTD benefits for the full 2 years of eligibility. (Ex. A: Green Dep., pp. 159-161, 165; Ex. AR: Green Dep. Ex. 3, Plaintiff's Second Amended Response to BakeMark's Interrogatories, No. 18.)

77. In October 2012 Green applied for disability benefits with the Social Security Administration. He stated under oath in this application that he had been completely incapacitated from working since May 2, 2012. Based on this representation, Green was found by the SSA to be completely incapacitated from working since May 2, 2012. (Ex. A: Green Dep., pp. 167-171; Ex. AS: Green Dep. Ex 15, SSA Notice of Award; Ex. AT: Green Dep. Ex. 14, SSA Current Benefits Summary.)

78. Green confirmed in his deposition that his statements to the SSA were correct and that he has been completely incapacitated from working (for BakeMark or any other company) since May 2, 2012. (Ex. A: Green Dep., pp. 142-143, 146-147, 148; Ex. AR: Green Dep. Ex. 3, Plaintiff's Second Amended Response to BakeMark's Interrogatories, Nos. 14-16.)

**J.    Green's Misconduct Discovered in Litigation**

79. On February 3, 2014, BakeMark served written discovery requests on Plaintiff requiring Plaintiff to produce any statements (including any recordings) he had of BakeMark employees. (Ex. A: Green Dep., pp. 259-262.)

80.     On November 20, 2014, Green produced 12 audio recordings (of 12 separate conversations) he made from the Spring of 2012 while he was working at BakeMark, and on company time.  (*Id*., p. 262, 265, 488-489.)

81.     BakeMark had no prior knowledge of this misconduct.  (*Id*. p. 267, 271; Ex. AU: Ken Sparks Affidavit, ¶¶ 5-6.)

82.     Green testified that in April and May 2012 Green secretly recorded conversations he had with five individuals: Weltzin, a direct report (a supervisor), an hourly warehouse employee, and two BakeMark vendors.  (Ex. A: Green Dep., pp. 271, 481, 486, 489, 492-493, 495, 507; Ex. AU: Sparks Affidavit, ¶ 7.)

83.     Each of these secretly recorded conversations involved confidential BakeMark information.  As a condition of his employment with BakeMark, he was obligated to following BakeMark's policies and protect confidential and proprietary business information.  (Ex. A: Green Dep., pp. 209-210, 217-219, 221, 266, 270; Ex. B - Green Dep. Ex. 23, Offer Letter, Ex. AV: Green Dep., Ex. 31, Handbook and Acknowledgment; Ex. AU: Sparks Affidavit, ¶ 8.)

84.     At the time Green secretly recorded these conversations he was "absolutely" aware that his behavior violated BakeMark policy.  (Ex. A: Green Dep., pp. 269, 270, 480; Ex. AU: Sparks Affidavit, ¶¶ 6, 10.)

85.     Four of the secret recordings were of Michigan residents (2 employees of one of BakeMark's vendors).  Green took no steps to determine whether his conduct violated any laws. (Ex. A: Green Dep., pp. 268, 271-273, 274; Ex. AU: Sparks Affidavit, ¶ 9.)

86.     Had BakeMark been aware of Green's misconduct during his employment Green would have been terminated.  (Ex. AU: Sparks Affidavit, ¶¶ 2-4, 11.)

### III.   LAW & ARGUMENT

**A.   Summary Judgment Standard**

Summary judgment is appropriate when the record shows "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party need not positively disprove the opponent's case; rather, it may prevail by establishing the lack of evidentiary support for that case. *See id*. at 325. A party must present more than mere speculation or conjecture to defeat a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Neither the "mere existence of some alleged factual dispute between the parties" nor the existence of some "metaphysical doubt as to the material facts" will defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**B.   Green Cannot Establish A *Prima Facie* Case For Disability Discrimination Under The ADA Or Ohio Law Because He Cannot Establish That He Is A Qualified Individual With A Disability; Cannot Establish That BakeMark Failed To Reasonably Accommodate Him; And Cannot Establish Individual Liability Under Ohio Law**

**1.   Green's Burden Of Proof**

In his Complaint, Green alleges that "upon reasonable accommodation by Defendants, [he] could have performed the essential functions of Operations Manager" and "Defendants refusal to allow [him] to return to employment was motivated by [his] disability and/or handicap." (Compl. at ¶¶ 60-61, 100-101, Counts 1 and 10.)

In order to establish a *prima facie* failure to accommodate claim under the ADA against BakeMark and under Ohio Rev. Code § 4112 against BakeMark and the individual Defendant [14]

---

[14] The same analysis applies to claims of disability discrimination under the ADA and under Ohio law. *See Myers*, 182 Fed. Appx. at 515 (citation omitted). However, there is no individual supervisory liability under the ADA, whereas "a

Green must show that: (1) he is disabled within the meaning of the statutes, (2) he is otherwise qualified, (3) BakeMark knew or had reason to know of his disability, (4) he requested an accommodation, and (5) BakeMark failed to provide the necessary accommodation. *See Burdett-Foster v. Blue Cross Blue Shield*, 574 Fed. Appx. 672, 680 (6th Cir. 2014); *Kempter v. Michigan Bell Telephone Co*., 534 Fed. Appx. 487, 490-491 (6th Cir. 2013); *Myers v. Cuyahoga County*, 182 Fed. Appx. 510, 515 (6th Cir. 2006). Thereafter, the burden would shift to BakeMark to demonstrate that Green could not reasonably be accommodated because the accommodation would impose an undue hardship. *See id*. For purposes of this motion, Defendants concede that Green can satisfy the first element of his *prima facie* and as set forth below, the Defendants were aware of the medical diagnosis and restrictions presented to it during Green's employment (element two of his burden). However, Green is unable to establish all other elements of his *prima facie* case and it is undisputed that Defendants reasonably accommodated Green throughout his employment.

First and foremost, Green cannot establish the second element of his *prima facie* case – namely, that he is a qualified individual with a disability. Even if he could, his claim fails under the remaining elements of his *prima facie* burden as BakeMark repeatedly and always reasonably accommodated Green. Indeed, with one exception, BakeMark gave Green the exact accommodation he sought. Thus, this claim comes down to a 1-month period of time in February/March 2012 when Green asked for a particular accommodation, and in response, BakeMark chose an alternative reasonable accommodation. In other words, this Court is not

---

supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct of the supervisor/manager in violation of Ohio Rev. Code § 4112." *See Mayes v. City of Oak Park*, 285 Fed. Appx. 261 (affirming summary judgment in favor of the individual defendants as to the plaintiff's ADA claim on grounds that the ADA does not provide for individual liability); *Genaro v. Central Transport, Inc*., 84 Ohio St.3d 293 (1999) (setting forth the standard for individual supervisory liability under Ohio Rev. Code § 4112). Thus, Green dismissed his disability discrimination claim under the ADA insofar as it was asserted against the individual defendants (12.11.2014, Doc. No. 8), but did not dismiss his disability discrimination claim under Ohio Rev. Code § 4112 insofar as it is asserted against the individual defendants.

presented with an employer who refused to accommodate a disabled employee; rather, the Court is presented with an employer who considered an employee's request for a particular accommodation in the context of its business needs, and selected an alternative reasonable accommodation – precisely what the ADA and its accompanying Regulations require.

The Sixth Circuit recently reaffirmed: "The Americans with Disabilities Act (ADA) requires employers to reasonably accommodate their disabled employees; it does not endow all disabled persons with a job—or a job schedule—of their choosing." *EEOC v. Ford Motor Co*., 782 F.3d 753, 757 (6th Cir. 2015). *See also Trepka v. The Board of Education of the Cleveland City School District*, 28 Fed. Appx. 455 (6th Cir. 2002) ("The employer need not provide the accommodation that the employee requests or prefers.  Instead, the employer retains the 'ultimate discretion' to choose another effective accommodation, even if less expensive or easier to provide.  Accordingly, an employee is not entitled to a particular reasonable accommodation if another reasonable accommodation is provided."); *Hankins v. Gap, Inc*., 85 F.3d 797, 800-801 (6th Cir. 1996) ("[A]n employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided.")

Moreover, Green's request for a particular accommodation was not reasonable because, by his own admissions, he could not perform the essential functions of the Operations Manager position during that time period, with or without a reasonable accommodation.  Thus, Green's claims under the ADA and Ohio Rev. Code § 4112 fail as a matter of law.

### 2.  Green Is Not A Qualified Individual With A Disability

The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions

21

of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).[15] Notably, the burden is on the employee to establish that with a reasonable accommodation he could perform the job. *See Burdett-Foster*, 574 Fed. Appx. at 680; *Kempter*, 534 Fed. Appx. at 490-491; *Myers*, 182 Fed. Appx. at 515. It is well settled under both the ADA and Ohio Rev. Code § 4112 that an employer is not required to accommodate an employee by removing essential job functions from a position or reassigning those duties to co-workers. *See EEOC v. Ford Motor Co*., 782 F.3d at 762-763 (noting that a reasonable accommodation "does *not* include removing an 'essential function[]' from the position, for that is *per se* unreasonable") (internal citation omitted) (emphasis in original); *see also White v. Standard Ins. Co*., 6th Cir. No. 12-1287, 2013 U.S. App. LEXIS 13368, *5 (noting that "a job function is essential if its removal would 'fundamentally alter' the position"); *Manigan v. Southwest Ohio Reg'l Transit Auth*., 385 Fed. Appx. 472, 476 (6th Cir. 2010) (same).

The relevant essential functions of the Operations Manager position are not in dispute. As admitted by Green, those essential functions include: (1) regular and predictable attendance, (2) the ability to work and be available to work more than 40 hours a week and more than 5 days a week, and (3) the ability to communicate verbally and effectively with management. (PUF ¶¶ 3, 6, 7, 47.) It is further undisputed that during the last 12 months of his employment, Green was only physically able to work for less than eleven weeks[16]. (PUF ¶¶ 16, 18, 29, 31, 41, 54, 63-73, 76, 79.)

---

[15] *See also* 29 CFR §1630.2(m)-(n) (a "qualified individual" is one "who satisfies the requisite skill, experience and education, and other job-related requirements of the employment position … and who, with or without reasonable accommodation, can perform the essential functions of such position"; "essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires").

[16] While Green claims he was able to work 4 hours a day, 5 days a week for 30 days beginning on February 19, 2012, such a schedule would not allow Green to perform all of the essential functions of his job and he was unwilling to verbally communicate with his manager. (PUF ¶¶ 40-43, 45.)

An individual, like Green, who cannot meet the attendance and hours requirements of his or her position is not a "qualified individual" with a disability under the law. *See EEOC v. Ford Motor Co.*, 782 F.3d at 762-763 (plaintiff was not a "qualified individual" where she could not satisfy the essential function of regular, in-person attendance); *White*, 2013 U.S. App. LEXIS 13368, *7 (plaintiff was not a "qualified individual" where she had a four-hour work-day restriction and full-time work was an essential function of the position); *Manigan*, 385 Fed. Appx. at 478 (plaintiff was not a "qualified individual" where he had a restriction of driving no more than eight hours a day and the ability to drive more than eight hours when the route required it was an essential function of the position); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418-19 (6th Cir. 2004) ("plaintiff, as a matter of law, would not have been qualified to perform the essential functions of [his] position due to his excessive absenteeism"); *Soletro v. Nat'l Fed'n of Indep. Bus.*, 130 F.Supp.2d 906, 914 (N.D. Ohio 2001) (plaintiff was not a "qualified individual" where she could not meet the attendance requirements of her position). Moreover, it is further undisputed, with Green fully acknowledging that he was unwilling during significant periods of time, in his final year of employment to communicate verbally with BakeMark, including his General Manager (Weltzin).

### 3. BakeMark Always Reasonably Accommodated Green

Even if Green were a qualified individual with a disability under the law, he cannot establish that BakeMark failed to reasonably accommodate him. BakeMark went above and beyond its obligation to accommodate Green, including affording him multiple leaves of absence throughout the course of his employment, during which he continued to receive all benefits of employment (including health insurance, seniority, and disability benefits pursuant to BakeMark's short-term disability plan). (PUF ¶¶ 16, 18, 29, 31, 41, 44 54, 63-73, 76, 79.)

Indeed, during Green's last 12 months of employment, he only worked a total of approximately 11 weeks; BakeMark held Green's job open the entire time.  (*Id*.)

Each of the following requests by Green and responses by BakeMark are undisputed:

- Green requested and was approved for job-protected leave from September 21-October 17, 2011, as an accommodation (PUF ¶¶ 16, 18);

- Green requested and was approved for block FMLA leave from November 25, 2011 until January 2, 2012 (PUF ¶¶ 29, 30);

- On January 24, 2012 Green requested and was approved for an extension to his FMLA leave until February 19, 2012 (PUF ¶ 32);

- On January 27, 2012, Green requested and was approved for an to extension to his leave until March 15, 2012 (PUF ¶¶ 32, 41); and

- From beginning on March 19, 2012 until March 30, 2012 BakeMark accommodated Green with a limited work schedule (8 hours a day, 40 hours a week) (PUF ¶¶ 44, 46-51.).

The <u>only</u> accommodation Green requested and did not receive was his request to return to work on part-time schedule beginning on February 19, 2012 and continuing for 30-days.  Prior to receiving this request, the last return to work date BakeMark had received for Green was March 15, 2012. (PUF ¶ 33.)   Green fully acknowledged that it was reasonable for BakeMark to make plans based on that representation.  (PUF ¶¶ 32, 35, 36.)

BakeMark (Waters, Gomez, and Sparks) met and considered Green's request and its business needs.  (PUF ¶ 40.)  Taking into account its business needs, Green's essential functions, and his restrictions, BakeMark ultimately chose to provide Green with another reasonable accommodation.  (PUF ¶ 41.)    Specifically, BakeMark agreed to extend Green's job protected leave for 30-days (following the expiration of his FMLA entitlement), thus allowing him to receive short term disability financial benefits and all other privileges of employment.  (PUF ¶¶ 41, 42.)  BakeMark's decision was based on the undisputed fact that Green could not perform the essential functions of his job in 4 hours a day, 5 days a week.  (PUF ¶¶ 6, 47.)  If Green came

back to work at 4 hours a day, 5 days a week, BakeMark replacement managers would have still been needed to cover for Green and, thus, BakeMark would have had to pay two managers[17] to perform the job and would also have had to pay their travel expenses to get to the Fairfield facility, including airfare and hotel expenses. (PUF ¶¶ 6, 47, 35, 36.) Thereafter, and based on doctor's notes from Green's doctor, BakeMark agreed to accommodate Green further by allowing him to work a reduced schedule beginning on March 19, 2012. (PUF ¶¶ 44-51.) Per the terms of Green's own doctor's note, he was fully released to return to work, with no restrictions after March 30, 2012. (PUF ¶ 50.)

### 4. BakeMark's Decision Not To Give Green The Specific Accommodation He Sought For Thirty Days In February And March 2012 Did Not Violate The Law.

Nonetheless, Green claims in this lawsuit that BakeMark and all the individual Defendants violated the ADA and Ohio law by not granting his request to work part-time for 30 days in February and March 2012. Neither BakeMark nor any of the individual Defendants violated the law. As set forth above, the essential functions of the Operations Manager position include regular and predictable attendance and the ability to work more than 40 hours a week and more than 5 days a week. BakeMark was not obligated to create a new position or part-time position to accommodate Green. *See Kempter*, 534 Fed. Appx. at 492 ("[I]t is not reasonable for an employer to create a new position to accommodate a disabled employee."); *White*, 2013 U.S. App. LEXIS 13368, *7 (the employer "was not required to create a new part-time position where none previously existed…., and even working part-time [the plaintiff] could not have performed

---

[17] Under the Fair Labor Standards Act (FLSA), BakeMark would have been required to pay Green his full salary during that 30 day period, despite the fact that he was working less than 50% of the expected and needed hours. The general rule under the FLSA is that an employer may not make any deductions from an exempt employee's salary for partial day absences, unless one of seven exceptions apply. *See* 29 C.F.R. § 541.602. None of those seven exceptions were applicable to Green's situation as he had exhausted FMLA at the time of his request. *See id.* Moreover, even if the FLSA allowed Green's salary to be pro-rated (which it did not), Green would have earned less in wages then he received in STD benefits.

the essential functions of the job….”); *Rabb v. The School Board of Orange County Florida*, 590 Fed. Appx. 849, 853 (11th Cir. 2014) (finding that requiring the employer to fund a temporary, part-time position, or to create another part-time position for the plaintiff would not be a reasonable accommodation).[18]   Moreover, Green testified that throughout the relevant time period he was unwilling to communicate with his direct supervisor, even when given direct orders to do so.  (PUF ¶¶ 43.)   Green fully acknowledged that the ability to communicate verbally and effectively with his direct manager was an essential requirement of his job.  (PUF ¶ 7.)  For all these reasons, Green's requested accommodation was not reasonable, as a matter of law, because he was unwilling or unable to perform the essential functions of his job with the accommodation he proposed.

Furthermore, even if Green's requested accommodation was reasonable (which it was not), BakeMark was not legally required to consider and grant that request in a vacuum.  Rather, BakeMark was legally entitled to consider all relevant facts (including its business needs) in determining how best to address both Green's restrictions and its own business needs.  In lieu of the requested accommodation, BakeMark extended Green's job-protected leave for 30 days; although not the accommodation Green preferred, the extended leave constituted a reasonable accommodation.  Indeed, the EEOC and courts in this jurisdiction and throughout the country have repeatedly recognized that a disabled employee is not entitled to the accommodation of his or her choosing and, further, have specifically recognized that job-protected leaves of absences constitute a reasonable accommodation for a disabled employee.  *See* 29 C.F.R. § 1630.2(o); *EEOC v. Ford Motor Co.*, 782 F.3d at 757 ("The ADA requires employers to reasonably

---

18   *See also* 29 C.F.R.§1630.2(p)(2) (establishing that the nature and net cost of the accommodation, and the impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business are factors to be considered in determining whether a proposed accommodation constitutes an undue burden).

accommodate their disabled employees; it <u>does not</u> endow all disabled persons with a job – or <u>job schedule</u> – of their choosing.") (Emphasis added); *Trepka*, 28 Fed. Appx. at 459-560 ("The employer need not provide the accommodation that the employee requests or prefers. Instead, the employer retains the 'ultimate discretion' to choose another effective accommodation, even if less expensive or easier to provide. Accordingly, an employee is not entitled to a particular reasonable accommodation if another reasonable accommodation is provided."); *Hankins*, 85 F.3d at 800-801 ("[A]n employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided."); *Matthews v. Village Center Community Development District*, M.D. Fla. No. 5:05-cv-344, 2006 U.S. Dist. LEXIS 85906, *53-55 (finding that the plaintiff's request for part-time work on a temporary basis was not reasonable and the employer's alternative of 12 weeks of full-time unpaid leave was a reasonable alternative, noting that "[a]lthough this may not have been [the plaintiff's] preferred accommodation, the ADA … does not require that [the employer] accommodate [the plaintiff] in any way she sees fit.")

Put simply, Green was always reasonably accommodated by BakeMark. BakeMark always gave Green the exact accommodation he requested – with one exception. And with respect to that exception in February/March 2012 – Green's requested accommodation was not reasonable because it did not allow him to perform the essential functions of his job and, even if reasonable (which it was not), BakeMark did not violate the ADA or Ohio law by selecting another reasonable accommodation that more fully addressed <u>both</u> Green's needs and BakeMark's business needs.

5.      **To The Extent Green's Disability Discrimination Claim Relates To Conduct After May 2, 2012, It Fails As A Matter Of Law Because By His Own Admission, He Was Completely Incapacitated From Working Beginning May 2, 2012 And, Therefore, Cannot Establish He Was A Qualified Individual With A Disability Under The ADA Or Ohio Law After May 2, 2012.**

It appears that Green may also attempt to assert to this Court that Defendants violated the ADA and Ohio law by failing to provide him a reasonable accommodation after May 2, 2012. Any such claim by Green, if made, would be frivolous.   On October 19, 2012, Green submitted an application for Social Security Disability benefits, under penalty of perjury, that as of May 2, 2012, he was completely incapable of working.  (PUF ¶ 77.)  In his deposition, Green testified that he provided only truthful and accurate information to the SSA in support of his application for disability benefits and that he understood, in order to be eligible for SSD benefits, he had to be completely incapable of working in "*any substantial gainful activity.*"   (PUF ¶¶ 76-78.) Based on Green's testimony, the SSA determined that Green was completely incapacitated from working as of May 2, 2012, and awarded him benefits (which continue today).  (*Id.*)  Green confirmed that the SSA's decision was accurate in his deposition.  (*Id.*) Green further testified in both his sworn Interrogatory response and in his deposition, that he has not sought work with any employer since May 2, 2012, because he was completely unable to work.  (*Id.*)  Thus, as a matter of law, Green cannot establish that he was a "qualified individual" with a disability.  *See Alsept v. Honda of America Mfg., Inc.*, S.D. Ohio No. 3:11-cv-395, 2013 U.S. Dist. LEXIS 77530, *21-22 (holding that the plaintiff, who applied for and received Social Security Disability benefits, was not a "qualified individual" under the Act, noting that "Social Security Disability is directly relevant to whether an employee is able to perform the essential functions of a job – i.e., whether the employee is a 'qualified individual.'")

Furthermore, any argument/claim by Green that his eventual termination by BakeMark in late September 2012 violated the ADA or Ohio law is equally meritless.  Green claimed to the

SSA, and in this lawsuit, that he has been completely incapacitated from working for any employer since May 2, 2012 (over three years). (PUF ¶¶ 77, 78.) It is further undisputed that from May 2, 2012 until September 26, 2012 (almost 5 months) BakeMark placed Green on a leave of absence, protected his job, and protected his eligibility for health insurance and other privileges of employment.[19] (PUF ¶¶ 71, 74.) Only after Green provided BakeMark with medical information that he was completely incapacitated from working and did not know when or if he would ever be able to return to work, BakeMark made the decision that it could no longer accommodate an indefinite leave. (PUF ¶¶ 72-74.) It is well-settled that an indefinite leave of absence is not a reasonable accommodation under either the ADA or Ohio law. *See Harris v. Circuit Court*, 21 Fed. Appx. 431, 432 (6th Cir. 2001) ("The ADA does not require an employer to give an employee an indefinite leave of absence when the employee cannot provide the expected duration of her impairment."); *Hammercheck v. Coldwell Banker First Place Real Estate*, 11th Dist. No. 2007-T-0024, 2007-Ohio-7127, ¶ 41 ("Neither Ohio's disability statute nor the ADA require an employer to give an employee an indefinite leave of absence when the employee cannot provide the expected duration of his or her impairment.")[20]

Finally, any such claim is barred under the ADA as Green failed to file an administrative charge with the EEOC alleging the same and failure to timely exhaust administrative remedies is an appropriate basis for dismissal of an ADA claim because exhaustion of administrative remedies is a condition precedent to an ADA action. See *Mayers v. Sedgwick Claims Mgmt.*

---

[19] This, of course, was all while Green was refusing to meet or speak with BakeMark to discuss how his "alleged" restrictions might impact his ability to perform all of the essential functions of his job. (PUF ¶¶ 66-70.) For example, if Green could only work 8 hours a day – what were the best 8 hours of the day that he should work? Which non-essential functions might BakeMark be able to take off his plate to allow him to focus on the most critical essential functions and if functions were removed, who would best be able to absorb those functions? As the Operations Manager – and just as the ADA envisions – Green needed to be an integral part of those discussions. And it was also during this period of time – and unbeknownst to BakeMark - that Dr. Groth provided two different opinions in the summer of 2012 regarding Green's ability to work – again, unbeknownst to BakeMark until discovery in this lawsuit. (PUF ¶ 67.)

[20] Of course, Green claims that his incapacity has lasted the past three years and is ongoing. Not only was Green's need for a leave of absence indefinite, the duration would have exceeded the bounds of reasonableness long ago.

*Servs.*, 101 Fed. Appx. 591, 593 (6th Cir. 2004) (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990), *Zipes v. TWA*, 455 U.S. 385, 392-398 (1982), *Parry v. Mohawk Motors of Mich., Inc*., 236 F.3d 299, 309 (6th Cir. 2000)).    Green's first and only administrative charge alleging that BakeMark failed to accommodate his disability was filed on May 17, 2012.  (PUF ¶ 75.)  While this date is after the last day worked by Green, it is 5 weeks before Dr. Groth authored his June 24, 2012 letter setting forth Green's alleged restrictions and 4 months before his termination.  (PUF ¶¶ 66, 74, 75.)  And while Green filed three more administrative charges, none of the charges allege that BakeMark failed to provide a reasonable accommodation or that his termination from BakeMark violated the ADA.  (PUF ¶ 75.)  Indeed, the first administrative charge filed after this termination from BakeMark simply alleges that BakeMark violated the ADA's anti-retaliation provision by contesting Green's claim for unemployment benefits. (*Id.*) *Jones v. Sumser Retirement Village*, 209 F.3d 851, 854 (6th Cir. 2000) (holding that the plaintiff failed to exhaust her administrative remedies by not including the failure to accommodate allegation when she filed her claim with the OCRC and, therefore, she was precluded from bringing up that issue at the time she filed her claim in court); *Leeper v. Verizon Wireless*, S.D. Ohio No. 2:08-CV-0727, 2009 U.S. Dist. LEXIS 60585, *5 (affirming dismissal of the plaintiff's failure to accommodate claim as a result of the plaintiff's failure to exhaust administrative remedies).  Therefore, Green's failure to exhaust any assertion by Green that BakeMark failed to accommodate him after May 2, 2012 (or that his termination was a violation of the ADA) under the ADA is also subject to dismissal due to Green's failure to administratively exhaust such claims prior to filing this lawsuit.

6.    **Green's Disability Discrimination Claim Insofar As It Is Asserted Under Ohio Law Against The Individual Defendants, Fails As A Matter Of Law Because There Is No Evidence That Gomez, Sparks, Waters, Weltzin, Or Witzel Engaged In Any Discriminatory Conduct**

To the extent Green's disability discrimination claim under Ohio Rev. Code § 4112 is asserted against the individual defendants – Rosemarie Gomez, Ken Sparks, Justin Waters, Steve Weltzin and Mike Witzel – it likewise fails. Ohio Rev. Code § 4112.02 makes it an unlawful practice for an "employer" to discriminate against a person because of a protected characteristic. Section 4112.01(A)(1) defines "employer" to include "any person acting directly or indirectly in the interest of an employer." *Genaro v. Ctr. Transp., Inc.*, 84 Ohio St.3d 293, 296 (1999) (citing R.C. 4112.01(A)(1)). Individuals may constitute an "employer" under Ohio Rev. Code 4112, *et seq.*, and thus be held individually liable. *Id.* at 300.

Individual liability for participating in discrimination under Ohio Rev. Code § 4112 attaches to an individual (1) "directly" making the decision to take an adverse action or (2) "indirectly" contributing to the decision-making process in a material and discriminatory way. *Sweet v. Abbott Foods, Inc.*, 10th Dist. No. 04AP-1145, 2005-Ohio-6880, ¶ 51; *Hopkins v. Canton City Bd. of Educ.*, 477 Fed. Appx. 349, 360-61 (6th Cir. 2012) (applying Ohio law); *Butler v. Cooper Standard Auto., Inc.*, 376 Fed. Appx. 487, 489-94 (6th Cir. 2010) (applying Ohio law). Merely holding a title or being at the "top of the foot chain," attending a meeting to discuss a discipline issue involving the plaintiff, providing factual information that results in a decision by officials above, or merely signing disciplinary paperwork does not qualify as "participation" for individual supervisor or manager liability purposes under Ohio law. *See id*.

Here, it is undisputed that BakeMark gave Green all of the accommodations he requested prior to May 2, 2012. Thus, the only decision Green takes issue with is the decision to grant him an extension to his job-protected leave in February/March 2012 (as opposed to the

accommodation he requested).  It is absolutely undisputed that neither Witzel nor Weltzin were involved in any way – let alone a material way - with that decision.  (PUF 40.)  With respect to Gomez, Sparks, and Waters, there is absolutely no evidence that the decision they made violated Ohio law.  As set forth in detail above, Green's requested accommodation was not reasonable and Gomez, Sparks, and Waters evaluated Green's restrictions and BakeMark's business needs and determined that an extension to his leave reasonably accommodated both Green and BakeMark.  Further, there is no evidence whatsoever that any of the individual defendants directly or indirectly materially participated in terminating Green's employment when he indicated that he was unable to return to work, with or without an accommodation.  To the contrary, Weltzin and Witzel do not even have any knowledge as to whether Green's employment was ever actually terminated.  (Ex. C: Weltzin Dep., p. 160; Ex. E: Witzel Dep., p. 9.)

Simply put, there is no factual or legal support for Green's disability discrimination claims against any of the Defendants, whether under the ADA or Ohio Rev. Code § 4112.  Therefore, they must be dismissed as a matter of law.

**C.**     **Green Cannot Establish A _Prima Facie_ Case For A Hostile Work Environment Because He Cannot Establish That His Workplace Was Permeated With Discriminatory Intimidation, Ridicule, And Insult Or That Any Alleged Intimidation, Ridicule, Or Insult Was Because Of His Alleged Disability**

**1.**     **Green's Burden Of Proof**

In his Complaint, Green alleges that he "suffered from a disability and handicap and/or perceived disability and handicap", that he was subjected to unwelcome harassment by Defendants based on his "disability and handicap and/or perceived disability and handicap", that "the conduct of Defendants was severe and pervasive", and as a result he "suffered adverse employment actions…."  (Compl. at ¶¶ 86-89, Count 7.)

32

In order to establish a *prima facie* hostile work environment case under the ADA or Ohio Rev. Code § 4112, Green must demonstrate that: (1) he was disabled; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment unreasonably interfered with his work performance; and (5) Defendants either knew or should have known about the harassment and failed to take corrective measures. Hostile work environment harassment "involve[s] repeated conduct and require[s] the plaintiff to demonstrate that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the condition of the victim's employment and create an abusive working environment." *Love v. Elec Power Bd. of Chattanooga*, 392 Fed. Appx. 405, 409 (6th Cir. 2010) (internal quotations omitted); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (Conduct that is "merely offensive" will not suffice to support a hostile work environment action). Thus, Green must show that the work environment was "permeated with discriminatory intimidation, ridicule, and insult" and that any "intimidation, ridicule, and insult" occurred because of his alleged disability. *Waltherr-Willard v. Mariemont City Sch.*, 601 Fed. Appx. 385, 2015 U.S. App. LEXIS 2323, *6 (6th Cir.) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

It is important to note that there is no individual supervisory liability under the ADA and, therefore, to the extent this claim is asserted under the ADA against the individual defendants, it must be dismissed. *See Mayes v. City of Oak Park*, 285 Fed. Appx. 261 (affirming summary judgment in favor of the individual defendants as to the plaintiff's ADA claim on grounds that the ADA does not provide for individual liability). Further, to the extent this claim is asserted

under Ohio Rev. Code § 4112, it likewise must be dismissed because there is no evidence that any of the Defendants intimidated, ridiculed, or insulted Green, or that any alleged intimidation, ridicule, or insult was because of his alleged disability.

### 2. There Is No Evidence Green Was Subjected To An Unlawful Hostile Work Environment Because Of A Disability

Under no stretch of the imagination do Green's accusations (even if true for purposes of summary judgment) support an unlawful hostile work environment claim. When asked for specific examples of conduct that support this claim during his deposition, Green repeatedly was unable to do so. Even after repeated questioning, all Green was able to offer in terms of a specific comment by Weltzin (or anyone for that matter) was that Weltzin allegedly made an isolated comment to Green about "wobbling away" – with no date or context. (Ex. A: Green Dep., p. 424-426.) Green further testified that he "felt" like his alleged complaint to Weltzin about work hours was "like a joke" to Weltzin. (Ex. A: Green Dep., pp. 426-427.) Thus, Green's entire hostile work environment claim (as well as his retaliation claim discussed below) appears to be premised on his assertion that he was required to work long hours by BakeMark because of his subjective belief that Weltzin and/or BakeMark harbored some alleged animus against Green due to his medical condition. There is simply no evidence to support Green's theory or speculation.

It is undisputed that as of March 30, 2012, Green was fully released to return to work and Green offered no other medical information to BakeMark between then and his last day of work at BakeMark on May 3, 2012 (and he didn't see any medical providers). (PUF ¶¶ 50, 51, 53.) It is also undisputed that working long hours when the job called for it was an essential function of Green's position. (PUF ¶¶ 6, 47.) And that in the spring of 2012, Green's expectations were impacted by the poor overall performance of the Fairfield facility and the unexpected loss of 3

warehousemen (out of 9) – 2 for workplace injuries and 1 resignation. (PUF ¶¶ 54-56.) These factors ultimately culminated in Green choosing to stay at work 20 hours over May 2-3, 2012. (PUF ¶ 58.) Green admits no one from BakeMark required him to stay 20 hours (or even asked him to do so) and that he chose to do so because of critical business needs (including an unexpected serious injury to a vendor requiring medical attention when a loading door fell on him that evening). (PUF ¶ 58.) Green also required his hourly employees (whom he supervised) to work almost 20 hours that day too. (*Id.*) Thus, Green fully acknowledges that he was not singled out for excessive hours – and admitted in his deposition that the personnel and performance issues in the warehouse that spring impacted everyone, including him. (PUF ¶¶ 58, 59.)

In a nutshell, Green does not dispute that critical business needs made him reach the decision that he needed to work long hours that evening. Thus, for Green's theory – that BakeMark forced him to work excessive hours because of animus relating to his medical condition – to hold water, Green would necessarily have to possess admissible evidence showing that BakeMark intentionally created the performance and personnel issues that were impacting the facility at that time – and that it did so to force Green to work excessive hours because of unlawful animus because of his medical condition. In other words, BakeMark was willing to lose customers, revenue, and employees to harass (or retaliate against) Green. This theory is not only speculation at its worst – but it defies common sense and is directly contradicted by the record. Indeed, it is undisputed that throughout the spring of 2012 BakeMark was focused on bringing help to the facility – including Witzel flying in to help Green in late April and the approval and hire of two exempt supervisors reporting to Green. (PUF ¶¶ 57.) *Thompson v. Bd. of Educ.*, S.D. Ohio No. 3:12-cv-287, 2013 U.S. Dist. LEXIS 161175, *23 n.8 (granting

summary judgment in favor of the defendant on the plaintiff's age discrimination claim, noting that "[m]uch of the Plaintiff's purported evidence of discriminatory treatment is based on his own subjective beliefs and speculation); *Nuritdinova v. Cincinnati Children's Hosp*., S.D. Ohio No. 1:13-cv-888, 2015 U.S. Dist. LEXIS 73869 ("Because there is no evidence at all that any supervisor or decision-maker discriminated against Plaintiff in any manner, Defendant is entitled to summary judgment on Plaintiff's claims. Plaintiff's reliance on nothing more than speculation and conjecture to support her assertions of discrimination is not sufficient to proceed to trial."); *Geary v. UC Health*, S.D. Ohio No. 1:13-cv-300, 2015 U.S. Dist. LEXIS 79903 (granting summary judgment in favor of the defendant employer and noting that the "Plaintiff's theory of discriminatory animus rests on nothing more than speculation and conjecture").

But perhaps one of the most compelling pieces of evidence in this case is Green's secret recording of his final conversation with Weltzin, as he was leaving the facility on May 3, 2012, for the last time. When Green made Weltzin aware that he had just worked 20 hours, Weltzin told Green to go home and further responded: "*God love you, but that doesn't do it.*" (PUF ¶¶ 59, 60.) Thus, Weltzin was making clear that Green working those hours was not the answer to fixing the problems at Fairfield. Moreover, Green makes absolutely no mention of a medical condition and Green conceded in his deposition that other than communicating that he had worked all night he used no other words that put Weltzin on notice that his hours were a concern – let alone a concern to his safety or health. (PUF ¶ 59.) Weltzin then asks Green to go home and rest and come back for the night shift (8.5 hours later). (PUF ¶ 60.) It is undisputed that Weltzin did so because he and Green had previously identified that the night shift was the source of issues in the warehouse and it was a request that was customary with Weltzin's work experience. (*Id.*) There is absolutely no evidence that Weltzin made that request to harass or

retaliate against Green in any way.  Green did not object or ask to discuss Weltzin's request. (*Id.*)

Put simply, Green cannot establish that he was subjected to a work place "permeated with discriminatory intimidation, ridicule, and insult" as a matter of law.  Moreover, even if he could reach that high threshold with admissible facts, there is nothing linking any of the incidents or events he takes issue with to animus relating to his medical condition.  Thus, this case presents the Court with <u>two</u> independent and determinative reasons why Green's hostile work environment claim fails as a matter of law.  *See Waltherr-Willard v. Mariemont City Sch.*, 601 Fed. Appx. 385, 2015 U.S. App. LEXIS 2323, *7 (affirming summary judgment in favor of the employer where, "at most, [the plaintiff] showed that her co-workers circulated unkind emails about her behind her back, and that her boss once yelled at her for reasons unrelated to her age or disability"); *Alsept*, 2013 U.S. Dist. LEXIS 77530, *15 (finding that the plaintiff's hostile work environment claim failed where he "failed to make any showing that what he alleges were hostile statements were in any way related to his mental impairment – a co-worker calling Plaintiff by the nickname "Coach" 10 or more times, a "mother-effer" once, and joking that Plaintiff is leaving his employment to work at McDonalds is wholly unrelated to his claim that he was harassed on the basis of his depression or anxiety").  Therefore, Green's hostile work environment claim fails as a matter of law and must be dismissed.

**D.      Green Cannot Establish A *Prima Facie* Case For FMLA Interference Because He Cannot Establish That Defendants Denied Him FMLA Benefits To Which He Was Entitled Or Interfered With The Exercise Of His FMLA Rights**

**1.      Green's Burden Of Proof**

In his Complaint, Green alleges that Defendants "interfered with, restrained, and/or denied the exercise of [his] Family and Medical Leave Act rights."  (Compl. at ¶ 95, Count 9.) The FMLA entitles "an eligible employee to take not more than 12 weeks of unpaid leave, or

substituted paid leave, for reasons that include a serious health condition that makes the employee unable to perform the functions of his position." *Harris v. Metro. Gov't of Nashville and Davidson County*, 594 F.3d 476, 482 (6th Cir. 2010) (citing 29 U.S.C. § 2612(a) and (d)). Under the FMLA it is "unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]." 29 U.S.C. § 2615(a)(1).  For a claim of interference, Green must establish that (1) he was an eligible employee, (2) BakeMark was a covered employer, (3) he was entitled to leave under the FMLA, (4) he gave BakeMark notice of his intent to take leave, and (5) BakeMark denied him FMLA benefits or interfered with FMLA rights to which he was entitled.  *Harris*, 594 F.3d at 482 (citation omitted); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (citation omitted) (citing *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004).  To be an eligible employee under the FMLA, an employee must among other things, have worked for the employer for at least twelve months. *See* 29 U.S.C. § 2611(2)(A)(i).

## 2. BakeMark Did Not Deny Green FMLA Benefits Or Interfere With The Exercise Of His FMLA Rights

Green's claim that BakeMark unlawfully interfered with his FMLA rights is frivolous.[21] It is undisputed that throughout Green's first leave of absence for surgery he was not eligible for FMLA (had not worked for BakeMark for at least 12 months).  (PUF ¶¶ 16, 17.) Thereafter, when Green requested a leave of absence beginning in November 2012, BakeMark (and specifically Waters) gave Green all of the required notifications and designated his leave as protected FMLA.  It is further undisputed that Green received his full 12 weeks of FMLA (and then some).  (PUF ¶¶ 29-34.)   In total, BakeMark approved a job protected leave for Green from

---

[21]   In February 2015, BakeMark put Green and his prior counsel on formal notice that his FMLA claim was meritless and requested that they dismiss this claim.  (Doc. 45, Exh. B.)

November 25, 2011 through March 26, 2012 (*i.e.*, <u>17 weeks</u>).[22]  (PUF ¶¶ 29-34, 41, 42, 51, 52.)

Thus, Green's FMLA interference claim fails as a matter of law.  *See Jaszczyszyn v. Advantage Health Physician Networ*k, 504 Fed. Appx. 440, 449 (6th Cir. 2012) (holding that the plaintiff's FMLA interference claim failed where she had been given all the leave to which she was entitled); *Grindstaff v. Sun Chem. Corp*., S.D. Ohio No. 1:09-cv-450, 2010 U.S. Dist. LEXIS 123426, *48-49 (holding that the Plaintiff's FMLA interference claim failed where he received all of the time off work that he requested).

> **3.     Green's FMLA Claim Fails Insofar As It Is Asserted Against The Individual Defendants Because Gomez, Sparks, Weltzin, And Witzel Did Not Exercise Sufficient Control Over Green's Leave And Employment Status And, Further, There Is No Evidence That Waters Denied Green FMLA Benefits To Which He Was Entitled Or Interfered With The Exercise Of His FMLA Rights**

To the extent Green's FMLA interference claim is asserted against the individual defendants – Rosemarie Gomez, Ken Sparks, Justin Waters, Steve Weltzin and Mike Witzel – it likewise fails.  The Sixth Circuit has not squarely addressed whether an individual employee in the private sector can be held liable as an employer under the FMLA; however, it has implied that individual liability exists because the FMLA's definition of employer mirrors that of the FLSA and the Sixth Circuit has interpreted the FLSA's language as imposing individual liability on private-sector employers.  *Mueller v. J.P. Morgan Chase*, N.D. Ohio No. 1:05 CV 560, 2007 U.S. Dist. LEXIS 20828, *65-66 (citing *Mitchell v. Chapman*, 343 F.3d 811, 831 n.22 (6th Cir. 2003)).

In the FLSA context, "the Sixth Circuit has used the 'economic reality' test, which imposes individual liability on a corporate officer with operational control of a corporations

---

[22]    BakeMark also approved a subsequent job protected leave for Green from May 3, 2012 through September 28, 2012 (i.e., <u>another 21 weeks</u>), even though Green had exhausted his FMLA leave entitlement.  (PUF ¶¶ 61-74.)

covered enterprise." *Millington v. Morrow County Bd. of Commissioners*, S.D. Ohio No. 2:06-cv-347, 2007 U.S. Dist. LEXIS 74348, *38 (citing *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994)). "The court looks to such factors as whether the officer had a significant ownership interest in the corporation, controlled significant day-to-day functions, determined salaries, or made hiring decisions." *Millington*, 2007 U.S. Dist. LEXIS 74348, *38 (citing Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 966 (6th Cir. 1991)).

District Courts within the Sixth Circuit have held that "[i]ndividual liability arises under the FMLA when the supervisor 'exercise[s] sufficient control' over the employee's leave and employment status." *Mueller v. J.P. Morgan Chase*, N.D. Ohio No. 1:05 CV 560, 2007 U.S. Dist. LEXIS 20828, *68 (citing *Phillips v. Leroy-Somer N. Am.*, W.D. Tenn. No. 01-1046-T, 2003 U.S. Dist. LEXIS 5334). Where, as is the case here, a plaintiff fails to establish that the individual defendants acted improperly as to the plaintiff's FMLA leave, dismissal of the individual defendants is warranted. *See Reddy v. J.P. Morgan Chase Bank*, S.D. Ohio No. 2:09-cv-1152, 2010 U.S. Dist. LEXIS 89162, *22 (dismissing FMLA claims against individual defendants where the plaintiff failed to allege that the individuals engaged in conduct that violated the FMLA).

Here, Gomez, Sparks, Weltzin, and Witzel were not involved in the administration of Green's FMLA leave of absence and, thus, there is no basis for individual liability against them. (PUF ¶37.) Waters handled the administration of Green's FMLA leave of absence and ensured that BakeMark complied with the FMLA in administering Green's FMLA leave of absence. (*Id.*) There is no evidence that Waters, or anyone else for that matter, denied Green FMLA benefits to which he was entitled or interfered with the exercise of his FMLA rights. Therefore,

40

Green's FMLA interference claims against the individual Defendants fails as a matter of law and must be dismissed.

**E.**     **Green Cannot Establish A *Prima Facie* Case For Retaliation Because He Cannot Establish A Causal "But For" Connection Between His Protected Activity and Any Adverse Action Under Ohio Law**

    **1.**     **Green's Burden Of Proof**

In his Complaint, Green alleges that he "engaged in protected activity and Defendants had knowledge of said protected activity and engaged in retaliatory conduct" and, as a result, he "suffered adverse employment actions." (Compl. at ¶¶ 68-69, Count 3.) Specifically, he alleges that his first protected activity was requesting FMLA leave on November 21, 2011. (Compl. at ¶¶ 20-29.) Similarly, in his sworn charge of discrimination filed with the EEOC in May 2012, Green alleged that the retaliation began after he requested an accommodation and it was denied.[23] As set forth above, the first request Green made that was denied was in February 2012.

Ohio Rev. Code § 4112.02(I) prohibits retaliation,[24] providing:

> It shall be an unlawful discriminatory practice for any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing….

In order to establish a *prima facie* case for retaliation, Green must show that: (1) he engaged in protected activity; (2) he was subjected to a materially adverse action; and (3) a causal link existed between the protected activity and the adverse action. *See EEOC v. Ford*,

---

[23]   Green's charge stated: "After I informed the Respondent that I needed a reasonable accommodation, my request for an effective reasonable accommodation was denied. Since I complained, I have been subjected to harassment as retaliation." (PUF ¶ 75.) A Notice of Right to Sue was issued September 20, 2013. Although Green filed three other charges, in his Complaint, Green only references the May 2012 Charge and September 20, 2013 Notice of Right to Sue. (Compl. at ¶¶ 52, 54.) Thus, insofar as Green is pursuing a retaliation claim, it appears to be limited to the allegations in the May 2012 charge.

[24]   In his Complaint, Plaintiff specifically indicates that his retaliation claim is brought pursuant to Ohio Rev. Code § 4112.02. (Compl. at Third Cause of Action, Heading.)

782 F.3d at 767; *White*, 2013 U.S. App. LEXIS 13368, *7-8; *Putney v. Contract Building Components*, 3rd Dist. No. 14-09-21, 2009-Ohio-6718, ¶¶ 48-49.[25]  If Green meets this burden, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for their action. *Id*. Thereafter, Green would have to establish Defendants' legitimate, non-retaliatory reason was a pretext for unlawful retaliation.  *Id*.  Importantly, Green must establish that unlawful retaliation was the "but for" or sole cause of any adverse action.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013); *EEOC v. Ford*, 782 F.3d at 767 (citing "but for" standard from *Univ. of Tex. Sw. Med. Ctr. v. Nassar* in the context of an ADA-related retaliation claim).

To the extent Green attempts to survive summary judgment on temporal proximity, courts have soundly rejected such an argument.  "[T]emporal proximity between a protected activity and a materially adverse action without other indicia of retaliatory conduct [which notably does not exist in this case] is not sufficient to establish the causal connection element of a retaliation claim."  *Putney*, 2009-Ohio-6718, ¶ 52 (citations omitted).  See also *Sosby v. Miller Brewing Co.*, 415 F.Supp.2d 809, 818 (S.D. Ohio 2005) ("[T]he mere fact that adverse employment actions occurred after the plaintiff engaged in protected activity is insufficient to support an inference of retaliation.").

**F.**     **There is No Causal Connection Between Any Protected Activity and the Denial of Green's Request to Work a Part-Time Schedule in February/March 2012 and/or Green's Hours Following His Return to Work in Late March 2012**

Green cannot establish a *prima facie* case for retaliation because he cannot establish a causal "but for" connection between his protected activity and any adverse action.  The only events Green takes issue with following his alleged protected activity are BakeMark's decision to grant him an accommodation other than the one he specifically requested in February 2012

---

[25]   [S]tate courts may look to federal case law regarding cases involving alleged retaliation."  *Putney*, 2009-Ohio-6718, ¶ 47 (citing *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196 (1981)).

and his claim that he was forced to work excessive hours in the spring of 2012.   For the sake of brevity, BakeMark will not repeat its arguments set forth above relating to each of these assertions.   Suffice it to say, the decision to grant Green an extended job-protected leave (as opposed to the request he wanted) was done for sound business reasons, and BakeMark ensured that Green would have a job to come back to after his leave and that he continued to enjoy all other benefits of employment (including financial STD payments).   Likewise, business demands and unexpected injuries and a resignation resulted in an increased workload on Green and his entire staff.  *See infra*, Sections B.3, B.4, and C.2.

**1.      There Is No Causal Connection Between Any Protected Activity And Green's Action Plan/Disciplinary Notices**

Defendants anticipate that Green may now seek to also claim that two disciplinary counselings he received in October 2011 support his claim for retaliation in violation of Ohio law.   Not only would such an assertion impeach his own testimony before this Court in his Complaint and in his sworn EEOC charge, but such an assertion in no way creates a material factual dispute.

One month after Weltzin was hired as the Fairfield General Manager and tasked with turning the facility around, the warehouse received a very poor audit report from a third party auditor.  (PUF ¶¶ 12, 13.)  In connection with that audit, in July 2011, Green was given an action plan to correct and address the deficiencies identified in the audit.  (*Id*.)  The results of the audit were so poor that the senior management in the Company instructed that the problems needed to be corrected immediately.  (*Id*.)  In August 2011, Weltzin also counseled Green regarding missing his budget and the need for immediate change.  (PUF ¶ 14.)

While Green was out for his first short leave of absence (two months <u>after</u> the action plan), Witzel (who flew in to cover for Green) discovered that serious deficiencies remained in

the warehouse – problems that Witzel made Green aware of early in Green's career and problems that Weltzin understood from Green had or were well on their way to being corrected. (PUF ¶¶ 20, 21, 23.)  After escalating the issue to Phillips (Vice President of Operations), Witzel created a formal action plan for Green incorporating the action plan from the summer, as well as several items he discovered.  (PUF ¶¶ 22.)  The action plan was incorporated into a written counseling issued to Green by Weltzin when he returned to work.  (PUF ¶ 23.)  Green testified that every task on the action plan was consistent with his job duties as the Operations Manager. (PUF ¶23.)

Where, as is the case here, performance-related concerns predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent actions, taken after the employer acquires such knowledge, are motivated by retaliation. *See Putney*, 2009-Ohio-6718, ¶ 58 ("[N]or will this Court allow temporal proximity alone to suffice when the employee is disciplined/terminated for the same problematic performance he/she engaged in both prior and subsequent to his/her protected activity without other indicia that there is a causal link between the protected activity and the adverse employment action."); *Sosby*, 415 F.Supp.2d at 822 ("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity.") (citation omitted).

In a completely unrelated event, during Green's first short leave in 2011, Gomez, in Human Resources in California, received an unsolicited call from a Fairfield driver who reported that he was being directed to falsify his DOT logs by an hourly driver who was left in charge. (PUF ¶ 24.)  Gomez made Mark Phillips, Vice President of Operations, aware of the complaint and Phillips (with Gomez's assistance) conducted an independent investigation, including

reviewing DOT logs.  (PUF ¶¶ 25, 26.)  Ultimately, Phillips made the decision to terminate a driver and issue Green a written counseling.  He also counseled Weltzin.  (PUF ¶ 27.)  Phillips made the decision to discipline Green because Green admitted to him that "running over hours" was "accepted practice" at the facility and because the investigation revealed that Green had left the hourly employee in charge during his leave (despite being counseled not to do so before).  (PUF ¶ 27.)

Any argument or assertion by Green that he should have been shielded from the consequences of poor performance solely because he took a leave of absence has been soundly rejected by courts in this jurisdiction, as well as courts across the country.  An employer is well within its rights to counsel and/or discipline an employee upon return from leave where the employer discovers information while the employee is on leave that would have justified the employee's counseling and/or discipline had the leave not been taken.  *See, e.g.*, *Murphy v. Ohio State Univ.*, 549 Fed. Appx. 315 (6th Cir. 2013) (employee's claim of FMLA retaliation failed where employer learned of misconduct while employee was on leave and disciplined employee upon return); *Cox-Frietch v. Ohio Bureau of Worker's Comp.*, S.D. Ohio No. 1:10-cv-323-HJW, 2012 U.S. Dist. LEXIS 19189 (employee's performance issues before, during, and immediately after leave supported employer's legitimate reasons for discipline).

There is absolutely no evidence that any of the individuals, let alone all of them, harbored a retaliatory motive simply because Green took a three week leave of absence for surgery relating to thyroid cancer – let alone any evidence of 'but for' causation.  *See EEOC v. Ford*, 782 F.3d at 767; *White*, 2013 U.S. App. LEXIS 13368, *7-8.  Thus, Green's retaliation claim fails as a matter of law and must be dismissed.

### G.  Green's Is Not Entitled To The Damages He Seeks

#### 1.  Green's Damages (If Any) Are Limited By His Admitted Misconduct For Which He Would Have Been Terminated

As a condition of Green's employment with BakeMark, he understood he was obligated to follow all of BakeMark's policies and expectations.  (PUF ¶ 83.)  Indeed, Green's offer of employment was expressly conditioned on his agreement to abide by the Company's policies and his agreement not to compromise or disclose confidential business information.  (*Id*.)

During discovery, Green produced audio files of 12 conversations he secretly recorded during his employment with BakeMark.  (PUF ¶¶ 79, 80.)  Green unabashedly testified that at the time he made the recordings that: (1) he "**absolutely**" knew he was violating BakeMark's policy; (2) he received no permission from anyone prior to making the recordings; (3) understood that he was recording confidential business information; and (4) undertook no efforts to determine if his deceptive recordings violated any law.  (PUF ¶¶ 83-85.)  In all, Green secretly recorded five individuals: his direct supervisor (Weltzin, the General Manager), his direct report (Transportation Supervisor), an hourly employee, and two outside BakeMark vendors located in Michigan.   (PUF ¶¶ 82, 85.)   The conversations Green covertly recorded all addressed confidential BakeMark business.  (PUF ¶ 83.)  Green also admitted he was aware of no other BakeMark employee who had covertly recorded conversations.  (PUF ¶ 81.)

Sparks, BakeMark's Vice President of Human Resources, testified that had he known of Green's willful misconduct during Green's employment he would have absolutely terminated his employment.  (PUF ¶ 86.)  Sparks, who would have been responsible for making the decision, testified that termination would be warranted because of: Green's management position with the Company, the willfulness and wantonness of Green's misconduct, the confidential and sensitive nature of the information being recorded, and the possibility that the recordings may have

violated Michigan state law[26] exposing BakeMark to potential liability and other business issues. (PUF ¶86.) This testimony is completely uncontroverted by Green.

The United States Supreme Court, in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995), held that where an employer can show it would have been entitled to terminate the employee for wrongdoing, if it had known of the employee's wrongdoing at the time, the employee's remedies for discrimination are limited. Thus, "where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.*; *see also Thurman v Yellow Freight Systems, Inc.*, 90 F.3d 1160 (6th Cir. 1996); *Lees v. Thermo Electron Corp.*, S.D. Ohio Case No. C2-06-984, 2008 U.S. Dist. LEXIS 86367, *34-36. "As a general rule, under the after-acquired evidence doctrine the employee is barred from obtaining front pay and reinstatement, and backpay is limited." *Thurman*, 90 F.3d at 1168 (citing *McKennon,* 513 U.S. 352). Courts have generally held that backpay should be barred after the date the misconduct is discovered. *Id.*

In the event any of Green's claims survive summary judgment (or Defendants' pending Motion for Sanctions), Defendants respectfully request that the Court grant partial summary judgment on the issue of damages and order that Green's recovery at trial is limited[27] to the period from his termination (September 26, 2012) to March 8, 2014.[28] *See, e.g., San v. Scherer*,

---

[26]  Michigan law makes it a crime to "use[] any device to eavesdrop upon [a] conversation without the consent of all parties." Mich. Comp. Laws § 750.539c. Michigan law also makes it a crime to "install, place, or use in any private place, without the consent of the person or persons entitled to privacy in that place, any device for observing, recording, transmitting, photographing, or eavesdropping upon the sounds or events in that place." Mich. Comp. Laws § 750.539d. Michigan law also prohibits you from "us[ing] or divulg[ing] any information which [you] know[] or reasonably should know was obtained in violation of the other wiretapping laws." Mich. Comp. Laws § 750.539e.

[27]  Defendants are, of course, reserving any additional defenses they have to Green's right to backpay and/or any amount of backpay.

[28]  Pursuant to Rule 34, Green was obligated to produce his secret recordings on or before March 8, 2014 in response to BakeMark's Request for Production of Documents. Green inappropriately failed to produce these recordings until

10th Dist. No. Nos. 97APE03-317, 97APE03-318, 1998 Ohio App. LEXIS 405, *49-50 (Ohio court of appeals affirming partial summary judgment order limiting damages based on after-acquired evidence that employee secretly tape recorded conversations during employment and manager's unconverted affidavit in support of motion that had he known of recordings he would have terminated employee).

### 2. Green Is Not Entitled To Punitive Damages Because He Cannot Establish That Defendants Acted With Malice

In his Complaint, Green seeks punitive damages for "Defendants' actions." (Complaint at ¶¶ 106-107.) Even if this Court finds that Green has created a genuine issue of material fact sufficient to withstand summary judgment (which he has not), the Court should still dismiss Green's claim for punitive damages. In order to establish an entitlement to punitive damages, Green must prove that Defendants acted with actual malice. *See Rice v. Certain Teed Corp*., 84 Ohio St.3d 417 (1999); *Asp v. Ohio Medical Transportation, Inc*., 10th Dist. No. 98AP-1063, 1999 Ohio App. LEXIS 2991, *20-21. "Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334, 336 (1987). In order to satisfy the "conscious disregard" prong of the malice standard, Defendants' actions must be "outrageous," "flagrant," or "criminal," exhibiting a "positive element of conscious wrongdoing." *Id*. at 335-336. "[S]omething more than negligence is always required." *Id*. (citation omitted).

Green is not entitled to punitive damages because he cannot establish that Defendants acted with malice. For all the reasons set forth herein, there is no evidence that Defendants acted

---

November 2014. (PUF ¶¶ 79, 80.) Plaintiff's improper delay in producing responsive recordings to BakeMark should not act to extend his damages.

with hatred, ill will or a spirit of revenge toward Plaintiff. There is also no evidence establishing that Defendants acted with a conscious disregard for the rights and safety of Plaintiff. Thus, to the extent Green's claims are not dismissed in their entirety, his claim for punitive damages must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court enter summary judgment in their favor as to Green's disability discrimination claim under the ADA and Ohio law (Counts One and Ten), retaliation claim (Count Three), hostile work environment claim (Count Seven), FMLA interference claim (Count Nine), and punitive damages claim (Count Twelve) – the only claims pending before this Court.

Respectfully submitted,


Natalie M. Stevens (0079963)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
127 Public Square
4130 Key Tower
Cleveland, OH 44114
Ph:      216.241.6100
Fax:     216.357.4733
Email:  natalie.stevens@ogletreedeakins.com


/s/ Kerri S. Reisdorff
Kerri S. Reisdorff *admitted Pro Hac Vice*
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4520 Main Street, Suite 400
Kansas City, MO 64111
Ph:      816.471.1301
Fax:     816.471.1303
Email:  kerri.reisdorff@ogletreedeakins.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 1, 2015, a copy of the foregoing *Defendants' Memorandum in Support of their Motion for Summary Judgment* was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

    Marc Mezibov
    Susan L. Butler
    The Law Office of Marc Mezibov
    401 E. Court Street, Ste. 600
    Cincinnati, OH 45202
    Phone: 513.621.8800
    Fax: 513.621.8833
    mmezibov@mezibov.com
    sbutler@mezibov.com

    *Attorneys for Plaintiffs*

                    */s/Kerri S. Reisdorff*_____
                    *One of the Attorneys for Defendants*

21702585.1