UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BRIAN GREEN, *et al.*,                    :        Case No. 1:13-cv-841
                                          :
       Plaintiffs,                        :        Judge Timothy S. Black
                                          :
vs.                                       :
                                          :
BAKEMARK USA, LLC, *et al.*,              :
                                          :
       Defendants.                        :

**ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT (Doc. 61)**

This civil action is before the Court on Defendants' motion for summary judgment

(Doc. 61), and the parties' responsive memoranda (Docs. 75, 93).

# I.        BACKGROUND

Plaintiffs Brian and Kathryn Green initiated this civil action on October 16, 2013,

asserting a number of claims related to actions taken by Plaintiff Brien Green's former

employer, Defendant BakeMark USA, LLC ("BakeMark"), and a number of its

employees, following Plaintiff Brian Green's thyroid cancer diagnosis.[1]  The following

claims remain pending:  disability discrimination under Ohio Rev. Code § 4112 (Count

One);  retaliation under Ohio Rev. Code § 4112 (Count Three); hostile work environment

(Count Seven);  Family Medical Leave Act (FMLA) interference (Count Nine); and

disability discrimination under the Americans with Disabilities Act (ADA) (Count 10).

---

[1] On April 22, 2015, the parties stipulated that all of Kathryn Green's claims were dismissed with
prejudice.  (Doc. 52).  Accordingly, Brian Green is the only remaining Plaintiff.

Plaintiff also continues to claim entitlement to punitive damages (Count Twelve).

Defendants move for summary judgment on all remaining claims.

## II.    UNDISPUTED FACTS[2]

1.  On October 25, 2010, Plaintiff Brian Green was hired by BakeMark as its operations manager at its Fairfield, Ohio facility.  (Doc. 62-1 at 206–07; Doc. 62-2).

2.  The Fairfield facility is one of BakeMark's regional distribution centers.  As such, it serves as the warehousing and distribution center for BakeMark's high volume bakery ingredient products for customers throughout the Ohio Valley region. (Doc. 62-1 at 157–58; Doc. 62-3 at 21).

3.  As the operations manager for the facility, Green was responsible for the overall management of the warehouse, as well as BakeMark's transportation fleet.  His duties included, but were not limited to: directing all warehouse and transportation operations and personnel to ensure timely customer deliveries; meeting planned budgets; and compliance with all BakeMark policies and procedures.  In a nutshell, Green was responsible for ensuring that customer orders were picked and loaded on trucks by warehouse personnel and delivered by BakeMark drivers in a timely and efficient manner.  (Doc. 62-1 at 157–58; Doc. 62-4).

4.  Green had various reporting obligations.  His direct supervisor was the general manager of the Fairfield facility.  BakeMark's Vice President of Operations, Mark Phillips, had ultimate authority over operations for BakeMark.  (Doc. 62-1 at 206, 222–23, 333).

5.  Green also received assistance from two senior operations managers, Chris Kapuska and Mike Witzel.  Eventually, in March 2012, Witzel was officially designated a regional operations manager with responsibility over the Fairfield facility.  (*Id.* at 223, 331–32; Doc. 62-5 at 7–10, 15–16).

6.  An essential function of the operations manager job was the ability to communicate verbally and effectively with management, including the general manager.  (Doc. 62-1 at 405–06).[3]

---

[2] *See* Docs. 62, 75-1.

[3] Green admits that the ability to communicate verbally and effectively with his direct supervisor is an essential function of the position *when he is working*, but not when he is on a leave of absence.

7. Green was hired to replace the prior operations manager who was demoted for poor performance. (*Id.* at 204–05, 222, 230–32, 234–35, 299, 311).

8. Upon his hire, Green was tasked with significantly improving the overall operation of the warehouse and transportation functions. (Doc. 62-1 at 222, 283–84, 311).

9. Given the poor performance of the facility, the general manager was demoted to a sales position in the spring of 2011. (*Id.* at 228–29, 233, 235).

10. In June 2011, Steve Weltzin was hired as the general manager of the Fairfield facility. Like Green, Weltzin was tasked with improving the overall performance of the facility. (*Id.* at 233, 235, 283–84; Doc. 62-3 at 10).

11. In July 2011, an outside auditor inspected the warehouse operations at the Fairfield facility and issued a report identifying multiple concerns. Given the seriousness of the audit results, they were escalated to the senior leaders of the entire company. Green was advised and understood that the concerns needed to be immediately addressed. (Doc. 62-1 at 284–288, 302–03; Doc. 62-6).[4]

12. In addition, in August 2011, Weltzin counseled Green that he was running significantly over budget, most notably in labor costs. Weltzin and Green determined that labor costs needed to be reduced immediately, and Green acted accordingly. Green described the Fairfield facility as being in "disarray" in August 2011. (Doc. 62-1 at 309–13; Doc. 62-7).

13. In August 2011, Green's warehouse supervisor resigned during an investigation for misconduct reported by Green. (Doc. 62-1 at 326–30).

14. In early September 2011, Green requested a leave of absence from September 22, 2011 to October 11, 2011 for surgery relating to the diagnosis of thyroid cancer. (*Id.* at 318–19, 321).

---

[4] Green admits that an audit was conducted and that a report was issued. Green explains that the audit report (Doc. 62-6) identified a number of concerns, ranked according to priority, and that one of the primary concerns was the unsafe condition of BakeMark's racking system. Witzel stated in an October e-mail that fixing the racking would not likely be completed until after the first of the year. (Doc. 62-9). In addition, securing the funds to fix the racking issues was "over [Green's] head." (Doc. 62-1 at 347). In fact, Green believed his efforts to address the racking problems were repeatedly ignored by upper management, and he ultimately reported the unsafe conditions to OSHA in April 2012. (*Id.* at 485). BakeMark received a citation and fine for the unsafe condition of the racking system. (*Id.*)

15. Weltzin approved Green's request for a job-protected leave of absence on September 8, 2011.  (*Id.* at 319–20; Doc. 62-3 at 109; Doc. 62-8; Doc. 62-9 at 43). Green was not eligible for leave under BakeMark's Family Medical Leave Act (FMLA) policy because he had not worked for the company for twelve months. (Doc. 62-1 at 319; Doc. 62-8 at 43).

16. Green requested, and Weltzin approved, a one-week extension of Green's leave until October 17, 2011.  (Doc. 62-1 at 321).

17. Green returned to work on October 18, 2011, with no restrictions from his doctor. (*Id.* at 322–23; Doc. 63, Ex. J).

18. Given the critical nature of Green's position at the facility, BakeMark flew in Witzel (at that time, a senior operation manager from Minnesota) to cover for Green during two weeks of Green's leave.  (Doc. 62-1 at 333–34; Doc. 62-5 at 15–16, 18–19; Doc. 62-9).

19. Witzel reported concerns to Mark Phillips, BakeMark's Vice President of Operations.  It was decided that Green would be placed on a formal action plan. Witzel then made both Weltzin and Green aware of his findings.  Witzel told Green that he was "committed to help [him] in any way [he] can."  (Doc. 62-1 at 333–35; Doc. 62-5 at 15–16; Doc. 62-9).

20. Given these discoveries by Witzel—most notably the issues that Green had incorrectly represented to Weltzin had been corrected, and had been pointed out by Witzel months earlier—Weltzin issued Green a written counseling incorporating Witzel's action plan on October 17, 2011.  Green signed the document without comment.  (Doc. 62-1 at 285, 288–89, 342–46; Doc. 62-3 at 61, 114–16; Doc. 62-5 at 15–16; Doc. 62-6; Doc. 62-10).

21. During Green's leave, Rosemarie Gomez, BakeMark's Human Resources Manager (located in California), received an unsolicited call from a Fairfield driver.  The driver reported that he was concerned that another hourly driver was instructing him to falsify Department of Transportation (DOT) logs regarding number of hours on the road.  (Doc. 62-11 at 8–9, 23–24).

22. In response, Mark Phillips, BakeMark's Vice President of Operations, ordered an investigation into the complaint.  (*Id.* at 24; Doc. 62-13).

23. The investigation involved Philips and Gomez interviewing drivers and reviewing multiple DOT logs (sent by Green). During the investigation, Green admitted to Phillips that DOT violations were an "accepted practice" among the drivers at the Fairfield facility. It was also confirmed that Green gave an hourly driver the authority to supervise drivers during his leave of absence (which ultimately resulted in the call to human resources). (Doc. 62-1 at 373–77, 381; Doc. 62-11 at 43–44; Doc. 62-12; Doc. 62-13).[5]

24. Phillips issued Green a written counseling on October 27, 2011, based on the results of his investigation. Phillips was specifically concerned by Green's failure to address and correct the DOT issues in the previous twelve months. Green signed the counseling without comment. (Doc. 62-1 at 376–77, 393-394; Doc. 62-12; Doc. 62-13).[6]

25. Phillips also specifically cautioned Weltzin that as general manager he was also responsible for ensuring the facility complied with all applicable laws and failure to ensure such compliance would result in discipline. (Doc. 62-1 at 397–98; Doc. 62-13).

26. On November 25, 2011, Green requested a leave of absence through January 2, 2012 for treatment related to an underactive thyroid. (Doc. 62-1 at 367; Doc. 63, Ex. P).[7]

---

[5] Green admits that he told Phillips that DOT violations were an accepted practice and that it was a problem. (Doc. 62-12). Green also admits that he sent driver logs to Phillips and Gomez but notes that BakeMark used a third party to audit drivers' logs for DOT violations. (Doc. 62-1 at 390). Green testified that he learned as a result of the complaint made to Gomez that drivers were submitting fraudulent paper logs that did not accurately report the hours they were driving and did not show a violation. (*Id.* at 391). Finally, Green denies that he *alone* gave an hourly driver the authority to supervise drivers during his leave of absence. Green discussed the matter with Weltzin before his leave and Weltzin approved of placing the driver in charge in Green's absence. (*Id.* at 378). Weltzin also testified that the hourly employee was supposed to be in charge of routing, but "took the initiative" to fill in as a "pseudo supervisor." (Doc. 62-3). Gomez testified that she was not sure who was supposed to make provisions for covering Green's responsibilities while he was on a leave of absence. (Doc. 62-11).

[6] Green states that his efforts to stop drivers from submitting fraudulent driving logs were opposed by senior management. (Doc. 62-1 at 379).

[7] Green admits that he requested a leave of absence on or about November 25, 2011 because he was unable to work the hours Weltzin was requiring him to work due to *fatigue* resulting from his underactive thyroid. (Doc. 62-1 at 368–69).

27. BakeMark timely approved Green's request and designated the leave as protected leave under its FMLA policy. BakeMark timely sent Green all of the required notices relating to his request and approval for FMLA leave. (Doc. 62-1 at 372; Doc. 62-8 at 77–78; Doc. 63, Ex. Q).

28. Green was not able to return to work on January 2, 2012. On January 6, 2012, Green's physician, Dr. Groth, stated that Green needed to be off work for "one month" due to "medical issues." (Doc. 62-1 at 408–09; Doc. 63, Ex. S).

29. BakeMark approved Green's request for an extension to his FMLA leave through February 19, 2012 (the date he exhausted his twelve weeks of FMLA leave). BakeMark also sent Green a letter noting that the company would need some additional information from Dr. Groth relating to Green's request to extend his leave following the expiration of his FMLA leave. (Doc. 62-1 at 413–14; Doc. 62-15).

30. Throughout Green's twelve weeks of FMLA leave, BakeMark held Green's operations manager position open. (Doc. 62-1 at 418–19).

31. As with Green's prior leave, BakeMark flew in Witzel and other out-of-state operations managers to cover Green's critical functions. (*Id.* at 400, 413–14; Doc. 62-5 at 25–26; Doc. 62-8).

32. Justin Waters, BakeMark's Workers' Compensation Leave Administrator (located in California), was responsible for responding to and approving Green's requests for FMLA. (Doc. 62-9 at 9–10, 15).

33. On Friday, February 16, 2012, Green submitted a note from Dr. Groth stating that he could immediately return to work four hours a day, five days a week and that his restriction would be in place for 30 days. (Doc. 62-1 at 415; Doc. 63, Ex. V).

34. BakeMark's human resources department, led by Ken Sparks, Vice President of Human Resources, and including Gomez and Waters (all located in California), met and considered Green's request, as well as other available reasonable accommodations, taking into account Green's restrictions and BakeMark's business needs. (Doc. 62-8 at 8, 11, 101; Doc. 62-11 at 8–9, 59–63; Doc. 62-16 at 7–8, 25–26).[8]

---

[8] Green notes that Mike Witzel testified that BakeMark had a firm policy at that time that employees were not permitted to return to work at BakeMark with any restrictions. (Doc. 74 at 20–21).

35. Ultimately, BakeMark decided to extend Green's job-protected leave for 30 days. (Doc. 62-1 at 417–19; Doc. 62-8 at 101; Doc. 62-11 at 61-63; Doc. 62-16 at 7, 26-27; Doc. 62-17).

36. Throughout this extension to his leave, BakeMark held Green's position open for him; Green continued to receive all benefits of employment (including health insurance and seniority); and Green was eligible for and received disability benefits pursuant to BakeMark's short term disability (STD) plan. (Doc. 62-1 at 417–19; Doc. 62-17).[9]

37. On March 16, 2012, Green sent BakeMark an e-mail attaching a note from Dr. Groth. Green's cover e-mail stated that he was released "without restrictions." However, Dr. Groth's attached note stated that Green could only work eight hours a day, five days a week. There was no time limit stated for these restrictions. (Doc. 62-1 at 420–22; Doc. 63, Ex. Y).

38. On March 19, 2012, BakeMark asked Green to obtain clarification from his doctor regarding whether he did, in fact, have restrictions and if so, whether the restrictions were permanent or temporary. (Doc. 62-1 at 432–33; Doc. 62-18).

39. BakeMark agreed to accommodate the restrictions while Green was seeking clarification. (Doc. 62-1 at 433, 438–39; Doc. 62-19; Doc. 62-20).

40. Green acknowledged that BakeMark's request was reasonable. He also acknowledged that had the eight-hour-a-day, five-day-a-week restriction noted by Dr. Groth been permanent he would not have been qualified for his operations manager position. (Doc. 62-1 at 432).

41. Green was instructed to return to work on March 20 and 21, 2012. Green did not report to work on either day. BakeMark held Green's job for him. (*Id.* at 433, 438–39; Doc. 62-19; Doc. 62-20).

42. Green was instructed to return to work on both March 22 and 23, 2012. Green reported that he was unable to come to work on either day due to a medical issue. BakeMark held Green's job for him. (Doc. 62-1 at 439–42; Doc. 63 Ex. AC).

---

[9] Green notes that his pay under the STD plan was approximately 67% of his standard pay.

43. On March 23, 2012, Green e-mailed a note from Dr. Groth, which clarified his previous note, stating that Green needed to be limited to eight hours a day, five days a week until March 30, 2012.  Dr. Groth also stated: "Effective March 30, 2012, Mr. Green may return to work without restriction."  (Doc. 62-1 at 441–42; Doc. 63, Ex. AC).

44. BakeMark granted Green the accommodation requested in the note.  (Doc. 62-1 at 438–39; Doc. 62-16 at 30-31; Doc. 62-19; Doc. 62-36).

45. Green worked as the operations manager from March 26, 2012 until May 3, 2012, when he went out on an approved leave. (Doc. 62-1 at 443, 495, 508).

46. Green did not see any medical providers between March 26, 2012 and May 2, 2012.  He also did not submit any medical notes to BakeMark during that time. (*Id.* at 443–44).

47. The operations issues in the warehouse continued throughout the spring.  Indeed, Green testified that the shipping errors were getting worse in April 2012.  (Doc. 62-1 at 454–55, 476–77; Doc. 62-26).

48. The warehouse had the following unexpected setbacks:[10]

   a. In late March 2012, a full-time warehouse employee resigned. (Doc. 62-1 at 456).

   b. In early April 2012, a full-time warehouse employee suffered a broken ankle, taking him off work for three months. (*Id.* at 455–56).

   c. In mid-April 2012, another full-time warehouse employee suffered a hernia, taking him off work for multiple months.  (*Id.*)

49. Each of these events, as well as the continuing problems in the warehouse, increased the workload of all warehouse employees, including management.  (*Id.* at 454–55). [11]

---

[10] Prior to these events, the warehouse was generally operating with 9–10 full-time employees. (Doc. 62-3).

[11] Green notes that he testified that Weltzin and Phillips repeatedly resisted his efforts to increase staffing levels with either direct hires or temporary staff.  (Doc. 62-1 at 459).

50. Green secretly recorded the last conversation he had with Weltzin prior to leaving the facility on May 3, 2012. At no time in this extended conversation does Green mention a medical condition. (*Id.*at 495–98, 501–05; Doc. 46-22).

51. During this conversation, at 1:48 p.m., Weltzin told Green to go home and to return to assist on the night shift at 10:00 p.m., as was customary in his experience. Green did not object or state that he was unable to return. (Doc. 62-3 at 97–101; Doc. 62-22).[12]

52. Green did not report to work on the evening of May 3, 2012. (Doc. 62-1 at 508; Doc. 62-3 at 152–53.)

53. On Friday, May 4, 2012, Green submitted a note from Dr. Groth stating that Green could report to work on May 7, 2012, with a temporary restriction of working 8 hours a day, 5 days a week. In response, BakeMark instructed Green to report to work on Monday, May 7, 2012. (Doc. 62-1 at 508; Doc. 62-3 at 153–55; Doc. 62-24).

54. Green did not report to work on either May 7 or 8, 2012. (Doc. 62-1 at 508; Doc. 62-3 at 153; Doc. 62-8 at 156; Doc. 62-24).

55. On May 9, 2012, Green submitted a note from Dr. Groth stating that Green could not work at all until Dr. Groth was able to evaluate Green's job duties and expectations. (Doc. 62-1 at 508).

56. Thereafter, BakeMark placed Green on approved job-protected leave of absence pending additional information from Dr. Groth. Green did not have any FMLA leave available. (Doc. 62-8 at 153–54; Doc. 62-15).

57. On June 24, 2012, Dr. Groth provided BakeMark with representations regarding Green's restrictions and ability to work. Dr. Groth indicated that Green could return to work, albeit with daily and weekly hours restrictions and physical restrictions for over 6 months. (Doc. 62-1 at 509–11; Doc. 62-27; Doc. 62-28; Doc. 63, Ex. AJ).

58. Thereafter, and in reliance on Dr. Groth's representations, BakeMark requested a meeting with Green to engage in the interactive process and discuss his restrictions. (Doc. 62-1 at 512–17).

---

[12] Green notes that he responded that he "would try." (Doc. 62-22).

59. Ultimately, in early August 2012, BakeMark and Green agreed to participate in a private mediation in early September to address the issue of whether Green's restrictions could be accommodated. (Doc. 62-16 at 74).

60. At the mediation on September 10, 2012, Green informed BakeMark for the first time that he was completely incapacitated from working for BakeMark and did not know when or if he would be able to return. (Doc. 62-1 at 151–52).

61. Thereafter, Green provided BakeMark with letters from two health care providers confirming that he was unable to work for BakeMark and stating that they did not know if or when he would ever be able to return. (Doc. 62-1 at 152–55; Doc. 63, Exs. AN, AO). [13]

62. On September 25, 2012, BakeMark notified Green that they were unable to accommodate an indefinite leave of absence and terminated his employment. (Doc. 62-1 at 156; Doc. 62-29).

63. In the summer and fall of 2012, Green applied for financial benefits under BakeMark's long-term disability (LTD) plan, which was administered by Aetna. Green asserted that he was entitled to the benefits because he was unable to work, and based on those representations, he was approved for significant financial benefits. Green received LTD benefits for the full two years of eligibility. (Doc. 62-1 at 159–61, 165; Doc. 62-31).

64. In October 2012, Green applied for disability benefits with the Social Security Administration (SSA). He stated under oath in this application that he had been completely incapacitated from working since May 2, 2012. Based on this representation, Green was found by the SSA to be completely incapacitated from working since May 2, 2012. (Doc. 62-1 at 167–71; Doc. 62-32; Doc. 62-33).

65. Green confirmed in his deposition that his statements to the SSA were correct and that he has been completely incapacitated from working—for BakeMark or any other company—since May 2, 2012. (Doc. 62-1 at 142–43, 146–47, 148; Doc. 62-31 at ¶¶ 14–16.)

66. On February 3, 2014, BakeMark served written discovery requests on Plaintiff requiring Plaintiff to produce any statements (including any recordings) he had of BakeMark employees. (Doc. 62-1 at 259–62).

---

[13] The letters indicated that Green was suffering from post-traumatic stress disorder and major depressive order.

67. On November 20, 2014, Green produced twelve audio recordings (of twelve separate conversations) that he made during the spring of 2012, while he was working at BakeMark, and on company time. (*Id.* at 262, 265, 488–89).

68. BakeMark had no prior knowledge of this misconduct. (*Id.* at 267, 271; Doc. 62-34 at ¶¶ 5–6.)

69. Green testified that in April and May 2012, he secretly recorded conversations he had with five individuals: Weltzin, a direct report, an hourly warehouse employee, and two BakeMark vendors. (Doc. 62-1 at 271, 481, 486, 489, 492–93, 495, 507; Doc. 62-34 at ¶ 7).

70. As a condition of his employment with BakeMark, he was obligated to follow BakeMark's policies and to protect confidential and proprietary business information. (Doc. 62-1 at 209–10, 217–19, 221, 266, 270; Doc. 62-2; Doc. 62-34 at ¶ 8; Doc. 62-35).

71. Four of the secret recordings were of Michigan residents (two employees of one of BakeMark's vendors). Green took no steps to determine whether his conduct violated any laws. (Doc. 62-1 at 268, 271–73, 274; Doc. 62-34 at ¶ 9).

## III.   STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV.    ANALYSIS

### A. Claim for Hostile Work Environment (Count Seven); Claim for FMLA Interference (Count Nine); and Claims Made Against Individual Defendants

Plaintiff does not oppose Defendants' motion for summary judgment insofar as it relates to his claim for hostile work environment (Count Seven); his claim for FMLA interference (Count Nine), or his claims against the individual Defendants, brought under Ohio law.  (Doc. 75 at 8).[14]  The evidence submitted to the Court demonstrates that, as to these claims, there is no genuine issue as to any material fact and Defendants are entitled to judgment as a matter of law.  (*See* Doc. 62 at 31–41, 45).  Accordingly, Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's claim for hostile work environment (Count Seven); Plaintiff's claim for FMLA interference (Count Nine); and Plaintiff's claims against the individual Defendants, brought under Ohio law.

### B. Disability Discrimination (Counts One and Ten)[15]

Discrimination under the ADA includes both (1) taking an adverse action against an employee "on the basis of disability" and (2) failing to make reasonable accommodations for the known limitations of an employee with a disability.  42 U.S.C.

---

[14] The individual Defendants are Steve Weltzin, Mike Witzel, Justin Waters, Kenneth Sparks, and Rosemarie Gomez.

[15] The "analysis of claims made pursuant to the Americans with Disabilities Act applies to claims made pursuant to Ohio Revised Code § 4112.02." *Jakubowski v. Christ Hosp.*, *Inc.,* 627 F.3d 195, 201 (6th Cir. 2010).

§ 12112(a), (b)(5)(A).  Although Plaintiff's claims center around assertions of failure to accommodate, he also maintains that these failures to accommodate ultimately resulted in his termination.  Accordingly, the Court considers both theories of liability.

### 1. Failure to Accommodate

An employer discriminates against an otherwise qualified individual on the basis of a disability when it does not make "reasonable accommodations to the known physical or mental limitations" of the individual, unless the employer can demonstrate that the accommodation would "impose an undue hardship on the operation" of its business.  42 U.S.C. § 12112(b)(5)(A).  In order for a plaintiff to set forth a *prima facie* case for failure to accommodate under the ADA, he must show that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) his employer knew or had reason to know about his disability; (4) he requested an accommodation; and (5) the employer failed to provide the necessary accommodation.  *Johnson v. Cleveland City Sch. Dist.*, 443 Fed. App'x 974, 982–83 (6th Cir. 2011).[16]  "Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer."  *Id.*

---

[16] To satisfy the second element of the *prima facie* case, the plaintiff must be "otherwise qualified" for the position, meaning that he bears the burden of showing he can perform the "essential functions" of the job, with or without accommodation.  42 U.S.C. § 12111(8); *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 456 (6th Cir. 2004).

Plaintiff claims that Defendant BakeMark failed to accommodate him in February, March, and June 2012.  Defendants argue that Plaintiff cannot establish the second, fourth, and fifth elements of his *prima facie* case.

### February 2012

Defendant BakeMark initially approved Plaintiff's request for protected FMLA leave through January 2, 2012.  (Doc. 62-1 at 367, 372; Doc. 62-8 at 77–78 Doc. 63, Exs. P, Q).  Plaintiff was unable to return to work on that date.  (Doc. 62-1 at 408–09).  On January 6, Plaintiff's physician, Dr. Groth, stated that Plaintiff needed to be off work for "one month" due to "medical issues." (Doc. 63, Ex. S).  On January 27, Plaintiff informed Steve Weltzin, the general manager of BakeMark's Fairfield facility, via e-mail that his doctor had finally placed him on a thyroid medication that was working, that it would take "a few weeks" for the medication to take full effect, and that he anticipated that he could return to work "around" March 15.  (Doc. 63, Ex. T).

Thereafter, Defendant BakeMark approved an extension of Plaintiff's FMLA leave through February 19, the date Plaintiff exhausted his twelve weeks of FMLA leave. (Doc. 62-15).  Defendant BakeMark also sent Plaintiff a letter noting that the company would need some additional information from Dr. Groth relating to Plaintiff's request to extend his leave beyond February 19.  (*See id.*)[17]  Defendant BakeMark flew in Mike Witzel, the operations manager of its Wisconsin facility, and other out-of-state operations

---

[17] Throughout Plaintiff's twelve weeks of FMLA leave, Defendant BakeMark held Plaintiff's operations manager position open.  (Doc. 62-1 at 418–19).

managers to cover Plaintiff's critical functions. (Doc. 62-1 at 400, 413–14; Doc. 62-5 at 25–26; Doc. 62-8).

On February 9, Plaintiff informed Weltzin that he was feeling better, and on February 15, Plaintiff informed Weltzin that he had an appointment on February 17, during which he expected to be cleared to return to work. (Doc. 84, Exs. 45F, 45H). On February 17, Plaintiff submitted a note from Dr. Groth stating that Plaintiff could immediately return to work four hours a day, five days a week and that his restriction would be in place for 30 days. (Doc. 62-1 at 415; Doc. 63, Ex. V).

Three members of Defendant BakeMark's human resources department met and considered Plaintiff's request and its business needs. (Doc. 62-8 at 8, 11, 101; Doc. 62-11 at 8–9, 59–63; Doc. 62-16 at 7–8, 25–26). Ultimately, BakeMark decided to extend Plaintiff's job-protected leave for 30 days following the expiration of his FMLA leave. (Doc. 62-1 at 417–19; Doc. 62-17; Doc. 62-11 at 61-63 Doc. 62-8 at 101; Doc. 62-16 at 7, 26-27).

"The Americans with Disabilities Act (ADA) requires employers to reasonably accommodate their disabled employees; it does not endow all disabled persons with a job—or a job schedule—of their choosing." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 757 (6th Cir. 2015). Put another way, an employee "cannot force [his] employer to provide a specific accommodation if the employer offers another reasonable accommodation." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008) (citing *Hedrick v. W. Reserve Care Sys. & Forum Health,* 355 F.3d 444, 457 (6th Cir. 2004)).

An employer does not fail to provide a reasonable accommodation when there is more than one accommodation, and the employer chooses a less expensive accommodation, an accommodation that is easier to provide, or an accommodation other than the accommodation that the employee prefers. *See Trepka v. Bd. of Educ.*, 28 Fed. App'x 455, 459 (6th Cir. 2002). "To prevail, [the plaintiff] must demonstrate a genuine issue of material fact with regard not only to her entitlement to her requested accommodation, but also to the inadequacy of the offered alternatives." *Id.* at 460. A "reasonable accommodation" may include "job restructuring [and] part-time or modified work schedules." *EEOC v. Ford Motor Co.*, 782 F.3d at 661 (citing 42 U.S.C. § 12111(9)(B)). However, an employer need not remove an "essential function" from the position; that is *per se* unreasonable. *Id.* (citations omitted).

An essential function is a fundamental job duty. 29 C.F.R. § 1630.2(n)(1). The regulations accompanying the ADA provide seven non-exclusive factors for determining whether a particular function is essential:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

First, Plaintiff fails to demonstrate a genuine issue of material fact with regard to his entitlement to his requested accommodation. Plaintiff relies on the testimony of Steve

Weltzin to support his contention that working a certain number of hours is never an essential function of the operations manager position.  Weltzin testified that working more than eight hours a day, five days a week "was not an essential job duty."  (Doc. 73 at 134).  Weltzin also testified Plaintiff did not have a set number of hours he was supposed to work; he was simply required to get the job done.  (*Id.* at 48–49).  However, Plaintiff sets forth no evidence that he could perform the essential functions of his job in four hours per day, five hours per week.  In fact, the evidence before the Court suggests otherwise.  For example, Mike Witzel testified that, when he was an operations manager in Wisconsin, he typically worked 60 or more hours a week when he started and, later, about 50 hours.  (Doc. 62-5 at 13).  Further, even Plaintiff acknowledged that, if he were permanently limited to working <u>eight</u> hours a day, five days a week, he would not be qualified for his position as an operations manager.  (Doc. 62-1 at 422).

Second, Plaintiff fails to demonstrate a genuine issue of material fact with regard to inadequacy of Defendant BakeMark's offered alternative.  Rather than grant Plaintiff's request for a schedule with restricted hours, Defendant BakeMark agreed to extend Plaintiff's job protected leave for 30 days following the expiration of his FMLA entitlement and to allow him to receive short term disability financial benefits and all other benefits of employment.  (Doc. 62-1 at 417–19; Doc. 62-8 at 101; Doc. 62-11 at 61-63; Doc. 62-16 at 7, 26-27; Doc. 62-17).  A job-protected leave of absence may constitute a reasonable accommodation for a disabled employee.  *See, e.g.*, *Cleveland v. Federal Express Corp.* 83 Fed. App'x 74, 79 (6th Cir. 2003) (a six-month leave of absence of six months was not unreasonable as a matter of law); *Cehrs v. Northeast Ohio Alzheimer's*

*Research Center*, 155 F.3d 755, 783 (6th Cir. 1998) (finding that a medical leave of

absence can constitute a reasonable accommodation under appropriate circumstances);

*Matthews v. Village Center Community Development*, No. 5:05-CV-344, 2006 WL

3422416, at \*15 (M.D. Fla. Nov. 28, 2006) (finding that the plaintiff's request for part-

time work on a temporary basis was not reasonable and the employer's alternative of 12

weeks of full-time unpaid leave was a reasonable alternative).[18]

     If Plaintiff came back to work for four hours a day, five days a week, replacement

managers would have still been needed to cover for Plaintiff and, to the extent required,

Defendant BakeMark would have had to pay the replacement managers' travel expenses

to get to the Fairfield facility, including airfare and hotel expenses.[19] Plaintiff argues that

the Fairfield branch would have had as much, if not more, management presence with

Plaintiff working part-time than it did with Plaintiff not working at all, and that

Defendant BakeMark was choosing between Plaintiff working part-time as the operations

manager, or the position remaining vacant. However, this speculation, in the face of

---

[18] Plaintiff attempts to distinguish *Matthews* on the grounds that the employer could not accommodate the plaintiff working part time because it hired a full time temporary employee to perform the plaintiff's critical job duties while the plaintiff was unable to work full time. However, the *Matthews* court reaffirmed that "[w]hether a company will staff itself with part-time workers, full-time workers, or a mix of both is a core management policy with which the ADA was not intended to interfere." *Id.* at \*16 (citing *Terrell v. USAir*, 132 F.3d 621, 627 (11th Cir. 1998)).

[19] Plaintiff Witzel, and Waters (BakeMark's Workers' Compensation Leave Administrator), testified that Defendant BakeMark flew in other managers to cover for Plaintiff. (Doc. 62-1 at 400, 413–14; Doc. 62-5 at 25–26; Doc. 62-8). That Witzel could not recall exactly how often he and Chris Kapuska, another operations manager, were at the Fairfield facility is not dispositive. (*See* Doc. 62-5 at 25–26).

record evidence that managers came to the Fairfield facility on various occasions to cover for Plaintiff, is not enough to create a genuine issue of material fact.

Plaintiff also alleges that Defendant BakeMark failed to engage in the interactive process. Plaintiff argues that, if Defendant BakeMark had so engaged, it would have learned that Plaintiff's ability to return to work, as a means to slowly build up his strength and stamina, was important to his recovery. (Doc. 67 at 57). However, on the same day he made his request for an accommodation, Plaintiff informed Laura Nesi, the office manager of BakeMark's Fairfield facility, of the medical reason for his request, and Nesi passed the information along to Defendant BakeMark's human resources department. (Doc. 94-1). Therefore, the record supports the conclusion that there were material communications between Defendant BakeMark and Plaintiff regarding his requested accommodation.

Finally, Plaintiff argues that Defendant BakeMark's alternative accommodation was inadequate because Defendant BakeMark had a rule prohibiting an employee from returning from a leave of absence until he could work without restrictions, and this rule was the true reason Defendant BakeMark denied the requested accommodation. In support of his contention, Plaintiff offers the testimony of Mike Witzel that "[u]p until a couple of years back, our standard policy was employees were not allowed to return to work until they could return to work with no restrictions." (Doc. 74 at 20).[20]

---

[20] Witzel similarly stated that, in 2011 and 2012, the policy was "[y]ou would not be allowed to work unless you have free—cleared with no restrictions." (*Id.* at 21).

19

However, all members of Defendant BakeMark's human resources department (*i.e.*, the individuals responsible for evaluating and approving accommodation requests) testified that Defendant BakeMark does <u>not</u> have such a policy.  They testified that Defendant BakeMark evaluates accommodation requests on a case-by-case basis, and they provided examples of workplace accommodations.  (Doc. 66 at 74–77; Doc. 71 at 65–70; Doc. 72 at 23–26).  In addition, the office manager at the Fairfield facility also gave examples of reasonable workplace accommodations granted in 2011 and 2012. (Doc. 70 at 26–29).  Most critically, Plaintiff's contention is directly belied by the evidence relating to his own request, as three members of BakeMark's human resources department met to discuss it.  (Doc. 62-8 at 8, 11, 101; Doc. 62-11 at 8–9, 59–63; Doc. 62-16 at 7–8, 25–26).  In light of this evidence, a reasonable juror could not believe that Defendant BakeMark had a policy prohibiting restrictions.

For all of these reasons, Plaintiff fails to establish the he second element (that he is otherwise qualified for the position) and the fifth element (that the employer failed to provide the necessary accommodation) of his *prima facie* case for failure to accommodate in February 2012.

### *March 2012*

On March 16, 2012, Plaintiff sent Defendant BakeMark an e-mail, with a note from Dr. Groth attached.  Plaintiff's e-mail stated that he was released "without restrictions."  However, Dr. Groth's attached note stated that Plaintiff could only work eight hours a day, five days a week, with no time limit stated for the restriction. (Doc. 62-1 at 420–22; Doc. 63, Ex. Y).  On March 19, Defendant BakeMark asked Plaintiff to

20

obtain clarification from Dr. Groth regarding whether he did, in fact, have restrictions and if so, whether the restrictions were permanent or temporary.  (Doc. 62-1 at 432–33; Doc. 62-18).[21]  On March 20, Defendant BakeMark sent Plaintiff a second e-mail that Plaintiff could return subject to the restriction as a temporary arrangement, that would last until clarification of the restriction or March 30, whichever came first.  (Doc. 62-14).[22]

On March 23, 2012, Plaintiff e-mailed a note from Dr. Groth, stating that Plaintiff needed to be limited to eight hours a day, five days a week until March 30, 2012.  Dr. Groth also stated: "Effective March 30, 2012, Mr. Green may return to work without restriction."  (Doc. 62-1 at 441–42; Doc. 63, Ex. AC).

Plaintiff argues there is a genuine issue of material fact as to whether working eight hours a day, five days a week, for *more than 10 days* upon his return to work would have been a reasonable accommodation.  However, Plaintiff never sought such an accommodation.  Instead, Defendant BakeMark was informed that the restriction was needed only through March 30.  (Doc. 62-1 at 441–42; Doc. 63, Ex. AC).

Plaintiff claims that he convinced his doctor to release him without restriction after March 30 because he believed that Defendant BakeMark had a policy of not accommodating restrictions.  (Doc. 75-2 at ¶ 7).  In a June 24 letter to Defendant

---

[21] Green acknowledged that BakeMark's request for clarification was reasonable.  (Doc. 62-1 at 432).

[22] Plaintiff was instructed to return to work on March 20 and 21; he did not report to work on either day.  (*Id.* at 433, 438–39; Doc. 62-19; Doc. 62-20).  Plaintiff was instructed to return to work on March 22 and 23; Plaintiff reported that he was unable to come to work on either day due to a medical issue.  (Doc. 62-1 at 439–42; Doc. 63 Ex. AC).  On all of these occasions, Defendant BakeMark held Plaintiff's job for him.

BakeMark, Dr. Groth stated that he had hesitantly allowed Plaintiff to return to work on March 30 without restrictions, at Plaintiff's request.  (Doc. 84, Ex. 57).

Nonetheless, Plaintiff has not presented any evidence that Defendant BakeMark had been placed on notice that Plaintiff's doctor had been "convinced" to release Plaintiff back in March 2012.  Further, Plaintiff did not see any medical providers between March 26, 2012 and May 2, 2012 and did not submit any medical notes to Defendant BakeMark during that time regarding any further accommodations.  (Doc. 62-1 at 443–44).  Plaintiff was given the only accommodation he sought in March 2012.  Accordingly, he fails to establish the fourth element (that he requested an accommodation) of a *prima facie* case as to any further accommodations.

### *Summer 2012*

On May 2, 2012, after working more than 24 straight hours, Plaintiff returned home and collapsed.  (Doc. 62-1 at 502, 508).  Plaintiff gave Weltzin a note from Dr. Groth stating that he could return on May 7 with a restriction of working no more than eight hours a day, five days a week.  (Doc. 73-1, Ex. 139).  Weltzin responded that Plaintiff should return on May 7 and that they would discuss the restrictions.  (*Id.*, Ex. 137).

On May 9, 2012, Plaintiff submitted a note from Dr. Groth stating that Plaintiff could not return to work until Defendant BakeMark clearly explained the number of hours Plaintiff would be required to work.  (*See* Doc. 62-1 at 508; Doc. 73-1, Ex. 140).  Thereafter, Defendant BakeMark placed Plaintiff on approved job-protected leave of absence.  (Doc. 62-8 at 153–54; Doc. 62-15).

On May 30, Waters sent Dr. Groth a letter explaining that Plaintiff could be expected to work 10 to12 hours per day and 50 to 60 hours per week; hours beyond that would not be expected. (Doc. 84, Ex. 56). The letter also indicated that Defendant BakeMark could not provide Plaintiff with an exact number of hours Plaintiff would be working on given days. (*Id.*) On June 24, Dr. Groth indicated that Plaintiff could return to work with the following restrictions: four hours a day, five days a week, for 14 days; thereafter, eight hours a day, five days a week, for six months. (Doc. 62-1 at 509–11; Doc. 62-27; Doc. 62-28; Doc. 63, Ex. AJ). Defendant BakeMark requested a meeting with Plaintiff to discuss his restrictions. (Doc. 62-1 at 512–17).[23]

Ultimately, in early August 2012, Defendant BakeMark and Plaintiff agreed to participate in a private mediation to address the issue of whether Plaintiff's restrictions could be accommodated. (Doc. 62-16 at 74). At this mediation, which occurred in early September, Plaintiff informed Defendant BakeMark that he was completely incapacitated from working for Defendant BakeMark and did not know when or if he would be able to

---

[23] Waters informed Plaintiff that Defendant BakeMark had all of the information it needed from Plaintiff's physician but it wanted to discuss the accommodation with Plaintiff by phone. (Doc. 72-1, Exs. 145, 147). Plaintiff responded that he thought the restrictions were pretty straight forward and that he would prefer the discussions to take place via e-mail. (*Id.*, Ex. 145). Waters did not identify what questions he had about Plaintiff's requested accommodation but insisted that the conversation take place verbally. (*Id.*, Ex. 147). Thereafter, Defendant BakeMark's corporate counsel contacted Plaintiff directly. (*Id.*, Ex. 148). Plaintiff agreed to have a verbal conversation with Defendant BakeMark about his restrictions but wanted to have his own counsel present, now that Defendant BakeMark's attorney was involved. (*Id.*, Ex. 149). Defendant BakeMark would not agree to a conversation with Plaintiff with his own counsel present. (*Id.*, Ex. 151).

return.  (Doc. 62-1 at 151–52).[24]  On September 2012, Defendant BakeMark notified Plaintiff that it was unable to accommodate an indefinite leave of absence and terminated his employment. (Doc. 62-1 at 156; Doc. 62-29).

Defendants argue that, as to any claims for failure to accommodate arising after May 2, 2012, Plaintiff cannot establish the second element (that he was a "qualified individual" with a disability) of his *prima facie* case because, by Plaintiff's own admission, he was completely incapacitated from work beginning on that date. Defendants note that on October 19, 2012, Plaintiff submitted an application for Social Security Disability benefits representing that, as of May 2, 2012, he was completely incapable of working.  (Doc. 62-1 at 167–71; Doc. 62-32; Doc. 62-33).[25]

As set forth by the Supreme Court:

[P]ursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim.  Nor does the law erect a strong presumption against the recipient's success under the ADA.  Nonetheless, an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work.  To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could "perform the essential functions" of her previous job, at least with "reasonable accommodation."

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 797–98 (1999) (emphasis added).

The Sixth Circuit has further explained:

---

[24] Plaintiff provided Defendant BakeMark with letters from two health care providers confirming this.  The letters indicated that Plaintiff was suffering from post-traumatic stress disorder and major depressive order.  (Doc. 62-1 at 152–55; Doc. 63, Exs. AN, AO).

[25] The SSA later awarded Plaintiff benefits.  (Doc. 62-32).

> [T]he social security regulations call for the awarding of SSDI benefits to any applicant who is not working and who has a "listed" impairment (see 20 C.F.R. pt. 404, subpt. P, app.1), regardless of whether the applicant is actually able to work. *See Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 804 (1999). A declaration of disability in an SSDI benefits application is thus not always equivalent to a factual statement that the applicant cannot perform the essential functions of his job. *See id.* at 802. On the contrary, such a declaration "often implies a context-related legal conclusion, namely, 'I am disabled for purposes of the Social Security Act.'" *Id.*

*Kiely v. Heartland Rehab. Servs., Inc.*, 359 F.3d 386, 389 (6th Cir. 2004).

Plaintiff explains the relationship between his SSDI application and ADA claims as follows:

> In this case, Green's physician indicated that Green could return to work on a limited basis in June 2012, working eight hours a day, five days a week. BakeMark refused him that accommodation. As far as his position with BakeMark was concerned, he was incapable of working because BakeMark refused to provide him with that accommodation. Later, in September 2012, Green was unable to return to BakeMark at all due to major depressive disorder and post-traumatic stress disorder. His ability to return to BakeMark with an accommodation is not inherently inconsistent with his receipt of SSDI benefits.

(Doc. 75 at 35).

An ADA suit claiming that the plaintiff can perform her job *with* reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job (or other jobs) *without* it. *Cleveland*, 526 U.S. at 803. However, here, Plaintiff has testified that he has been completely incapacitated from working—for Defendant BakeMark or any other company—from May 2, 2012 to present. (Doc. 62-1 at 146–48; *see also* Doc. 62-31 at ¶¶ 14–16). For this reason, the Court finds that

Plaintiff's SSDI contention is inconsistent with her ADA claim that she could "perform the essential functions" of her previous job, at least with "reasonable accommodation."

## 2.    Discriminatory Discharge

In addition to failure to accommodate claims, Plaintiff also maintains that Defendant BakeMark took adverse employment action against him.  Plaintiff's theory is that Defendant BakeMark's repeated failures to accommodate him eventually led to a constructive discharge, rendering him unable to work.

To establish a *prima facie* case of disability discrimination under the ADA, Plaintiff must establish that (1) he was disabled; (2) he was other qualified for the job, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) Defendant knew or had reason to know of his disability; and (5) the position remained open or a non-disabled person replaced him.  *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012).

An employee may show an adverse employment action by establishing that he or she was constructively discharged.  Constructive discharge "requires a finding that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1107 (6th Cir.2008) (internal quotations omitted). "A constructive discharge claim depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee." *Id.* (internal quotations omitted).  The Sixth Circuit recognized in *Talley* that under certain circumstances "a complete failure to

26

accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge." *Id.* at 1109 (internal quotations omitted). The *Talley* court emphasized that the defendants had, according to the plaintiff's evidence, refused to read a doctor's note that she had provided. *Id.* The Sixth Circuit emphasized, however, that it was not "pav[ing] the way for an employee to assert a claim for constructive discharge every time an employer fails to accommodate a disability." *Id.*

As set forth above, Defendant BakeMark considered Plaintiff's requested accommodation in February 2012, and, instead, provided him with an alternative reasonable accommodation. In March 2012, Defendant BakeMark gave Plaintiff the specific accommodation he sought. Finally, in the summer of 2012, Defendant BakeMark attempted to engage Plaintiff in the interactive process.[26]

Because Defendant BakeMark's decisions with regard to Plaintiff's requested accommodations are not unlawful, each of the cases cited by Plaintiff in support for his position is inapposite. *Gilday v. Mecosta County*, 124 F.3d 760, 761, 766 (6th Cir. 1997) (employer violated ADA by refusing an accommodation on grounds that the employee did not suffer from a disability); *Talley*, 542 F.3d at 1107 (employer violated the ADA by failing to provide any accommodation). Plaintiff cites no evidence to support a conclusion that it was reasonably foreseeable that he would develop post-traumatic stress

---

[26] Delays were attributable to both Plaintiff and Defendants.

disorder and major depressive order, which would prevent him from working indefinitely.[27]

Accordingly, for the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's claims for disability discrimination (Counts One and Ten).

### C. Disability Retaliation (Count Three)

Under Ohio law, it is an unlawful discriminatory practice:

For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

Ohio Rev. Code § 4112.02(I).

Plaintiff's retaliation claim, based on indirect evidence, is assessed under the *McDonnell Douglas* burden-shifting approach. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).[28] The initial burden falls on the plaintiff to present a *prima facie* case of

---

[27] An indefinite leave of absence is not a reasonable accommodation under either the ADA or Ohio law. *See Harris v. Circuit Court*, 21 Fed. App'x 431, 432 (6th Cir. 2001) ("The ADA does not require an employer to give an employee an indefinite leave of absence when the employee cannot provide the expected duration of her impairment."); *Hammercheck v. Coldwell Banker First Place Real Estate*, 11th Dist. No. 2007-T-0024, 2007-Ohio-7127, ¶ 41 ("Neither Ohio's disability statute nor the ADA require an employer to give an employee an indefinite leave of absence when the employee cannot provide the expected duration of his or her impairment."

[28] Plaintiff's disability retaliation claim is pled under Ohio law. "[S]tate courts may look to federal case law regarding cases involving alleged retaliation." *Putney v. Contract Bldg. Components*, 3d Dist. No. 14-09-21, 2009-Ohio-6718, ¶ 47 (citation omitted). The parties have not alerted the Court to any significant difference between federal law and Ohio law in the context of this type of claim.

retaliation. *Id.* at 414. To establish a *prima facie* case of retaliation, the plaintiff must show that: (1) the plaintiff engaged in protected activity; (2) the employer knew of that activity; (3) the employer took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).

Once the plaintiff has carried his burden, he has established a presumption that the defendant retaliated against him, and the defendant must attempt to rebut this presumption by showing that it had a legitimate, nondiscriminatory basis for its actions. *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013). If it can do so, the ultimate burden falls on the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by [Defendant] were not its true reasons, but were a pretext for" retaliation. *DiCarlo*, 358 F.3d at 414–15.

Defendants argue that Plaintiff cannot establish that fourth element of his *prima facie* case, that there was a causal connection between his protected activity and adverse employment actions taken by Defendant BakeMark. "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). "Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 737 (6th Cir. 2006).

**1.** *Prima Facie* **Case**

Plaintiff identifies his requests for leave (September and November 2011), his requests for limited work schedules (February, March, and June 2012), and his filing of an EEOC charge (May 2012) as protected activities. (*See* Doc. 75 at 40). Plaintiff argues that a reasonable juror could find a causal connection between his requests for leave and his eventual termination based on the following evidence.[29]

In September 2011, Plaintiff requested a leave of absence to undergo surgery related to his thyroid cancer. (Doc. 68 at 318, 321). During a conversation about his leave request with Steve Weltzin, the general manager at BakeMark's Fairfield facility, and Laura Nesi, the office manager at BakeMark's Fairfield facility, Weltzin asked Plaintiff to postpone his surgery for several months (until after the first of the year) because BakeMark's busiest season was approaching. (Doc. 75-2 at ¶ 3; Doc. 75-4 at ¶ 5).[30] Plaintiff declined Weltzin's request. (Doc. 75-2 at ¶ 5). Weltzin ultimately approved Plaintiff's request for leave. (Doc. 62-1 at 319–20; Doc. 62-3 at 109; Doc. 62-8; Doc. 62-9 at 43).

---

[29] These facts are largely taken from Plaintiff's statement of facts. (Doc. 75 at 9–15). For the purposes of this analysis, the Court assumes that statements attributed to Defendant BakeMark's employees are true. To the extent that Plaintiff also relies on Defendant BakeMark's alleged failures to accommodate as evidence of unlawful retaliation, the relevant facts are set forth in Section IV.B.1, *supra*.

[30] Plaintiff believed he was being asked to choose between his health and his job. (Doc. 75-2 at ¶ 5). When Plaintiff was hired, Mark Phillips, BakeMark's Director of Operations, told Plaintiff that Chris Plymale (Plaintiff's predecessor who had been demoted to warehouse manager) had taken FMLA leave, and that the company was unhappy about it because Plymale was "milking them." (Doc. 67 at 224–25). Based on this remark and Weltzin's request, Plaintiff believed his request for leave was not being looked at favorably. (Doc. 75-2 at ¶ 4).

Plaintiff returned to work on October 17, 2011. (Doc. 68 at 321). Upon his return, he received two written warnings. As to the first warning, Mike Witzel, an operations manager at BakeMark's Wisconsin facility who had been filling in for Plaintiff at the Fairfield facility, identified some concerns, including issues that he had pointed out to Plaintiff months earlier.[31] Witzel brought his concerns to Mark Phillips, BakeMark's Director of Operations. (Doc. 74 at 15–16). Witzel put together an action plan identifying the deficiencies and the person or persons responsible for addressing them.[32] Defendant BakeMark issued Plaintiff a written warning that incorporated Witzel's findings. (Doc. 84, Ex. 39

Plaintiff received the second warning on October 27, 2011. (Doc. 68, Ex. 51). During Plaintiff's leave, a driver at the Fairfield facility called human resources to report that another driver had asked him to falsify Department of Transportation logs regarding the number of hours he had driven. (Doc. 66 at 23–24). Phillips ordered an investigation into the complaint. (Doc. 62-11 at 24; Doc. 62-13). When he returned from leave, Plaintiff investigated and learned that drivers were submitting fraudulent log books that

---

[31] In July 2011, the Fairfield facility had received a poor report audit report. In connection with that report, Plaintiff had been advised that certain deficiencies needed to be addressed. (Doc. 62-1 at 309–13; Doc. 62-7).

[32] Several of the items were to be addressed by multiple people, and several of the items were to be addressed by people other than Plaintiff. (Doc. 84, Ex. 39). Witzel acknowledged that some of the deficiencies were outside of Plaintiff's control because other supervisors would have had to approve the necessary changes. (Doc. 74 at 16).

31

did not accurately report the number of hours they were driving. (Doc. 68 at 391).[33]

Plaintiff was disciplined because drivers at the Fairfield facility had been driving illegal

hours and because he allowed a non-exempt employee to supervise drivers during his

leave. (Doc. 68, Ex. 51).[34]

     Plaintiff was required to work an increasing number of hours when he returned in

October 2011. (Doc. 75-2 at ¶ 6). Plaintiff submits that he was afraid to object due to

Defendant BakeMark's attitude toward his first leave. (*Id.*) On November 25, 2011,

Plaintiff was forced to take another leave of absence due to extreme fatigue caused by

decreased thyroid function stemming from his cancer treatment. (Doc. 84, Ex. 49).

Jennifer Rogers, another BakeMark employee, noted that Weltzin treated Plaintiff less

favorably after Plaintiff returned from his leave of absence in October 2012, including

making negative comments about Plaintiff to Plaintiff's subordinates. (Doc. 75-4 at ¶ 6).

     Ultimately, Plaintiff returned from his leave of absence on March 26, 2012.

Defendant BakeMark lost three warehouse workers in March and April 2012, out of its

---

[33] Defendant BakeMark had been using a third party to audit the drivers' logs, and the third party had not found any violations. (*Id.* at 390). Plaintiff sought to address the problem by terminating drivers he discovered were driving illegal hours, and by installing GPS monitoring devices in the trucks that would accurately report the number of hours the drivers were on the road. (*Id.* at 379). Rosemarie Gomez, BakeMark's Director of Human Resources, told Plaintiff that he could not terminate the drivers. (*Id.*) And Phillips told Plaintiff to remove the GPS tracking devices he had just installed for financial reasons. (Doc. 66 at 51–52).

[34] Plaintiff conferred with Weltzin before his leave, and Weltzin agreed to have the non-exempt employee in question take on additional duties. (Doc. 68 at 378). According to Weltzin, the employee in question was supposed to fill in for routing, but he "took the initiative to fill in as a pseudo supervisor." (Doc. 73 at 122–23).

usual staff of 9 to10. (Doc. 68 at 455–56).[35] In April, Plaintiff contacted Rosemarie

Gomez to report that he felt he was being harassed by Weltzin and that he was being

forced to work "inhumane" hours. (*Id.* at 547). Plaintiff learned that the complaint was

reported to Weltzin, and the harassment worsened. (*Id.*) On May 2, 2012, Plaintiff

worked more than 24 straight hours. (Doc. 68 at 502). Several warehouse workers had

worked 18 to19 hours that day, and one quit as a result. (*Id.* at 497–98).

Plaintiff's primary argument in support of a causal connection is that the criticism

of his performance was unwarranted, especially in light of Weltzin's request that Plaintiff

postpone his leave. Even if Weltzin made the comment attributed to him, there is no

evidence linking the comment to Plaintiff's discipline.[36] With respect to the first written

warning, the catalyst for Weltzin's decision was Witzel's discovery of issues in

Plaintiff's department. (Doc. 62-1 at 333–35; Doc. 62-5 at 15–16; Doc. 62-9). Witzel

and Phillips put together the action plan for Plaintiff. (Doc. 93-4 at ¶¶ 9–10). When

Weltzin was made aware of Witzel's concerns and the action plan, he simply determined

that the plan should be incorporated into a written counseling because of the severity of

the continuing issues and because Plaintiff had made false representations to Weltzin that

---

[35] Plaintiff claims that he tried to address the critical staffing shortage, but Weltzin and Phillips resisted hiring permanent or temporary staff. (Doc. 68 at 459). However, in February 2012, Defendant BakeMark had promoted someone into the Transportation Supervisor position that had been vacated in August 2011. (Doc. 62-1 at 445–46; 451). Defendant BakeMark had also approved the hiring of a Warehouse Supervisor, which was an added position. (*Id.* at 449–52; Doc. 63, Ex. H).

[36] In fact, Plaintiff's contention is undercut by the fact that Weltzin timely approved Plaintiff's request for a leave even though he was not yet FMLA eligible. (Doc. 62-1 at 319–20; Doc. 62-3 at 109; Doc. 62-8; Doc. 62-9 at 43).

some of the items of the plan had been fixed. (Doc. 62-1 at 285, 288–89, 342–46; Doc. 62-3 at 61, 114–16; Doc. 62-5 at 15–16; Doc. 62-6; Doc. 62-10; Doc. 93-4 at ¶¶ 7–8). There is no evidence that Witzel or Phillips were aware of Weltzin's comment. In fact, Witzel and Phillips shared the opinion that the problems in the facility warranted a formal action plan. (Doc. 93-4 at ¶¶ 9–10).[37]

Plaintiff's argument that the second disciplinary notice was retaliation for his protected activity is even more strained. This second notice was unrelated to the first: Phillips issued Plaintiff a written warning in October 2012 for DOT violations at the facility. (Doc. 93-2 at ¶ 13). The catalyst of Phillips's investigation is undisputed—the human resources department received an unsolicited call from a driver reporting DOT violations. (Doc. 62-11 at 8–9, 23–24; Doc. 62-13; Doc. 93-2 at ¶¶ 11–14). Not only was Weltzin not involved with this decision, but Weltzin was also cautioned by Phillips that he could personally be responsible for any future violations at the facility. (Doc. 62-1 at 397–98; Doc. 62-13; Doc. 93-2 at ¶¶ 11–14).[38]

---

[37] *See also Sosby v. Miller Brewing Co.*, 415 F. Supp. 2d 809, 822 (S.D. Ohio 2005) ("evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity") (citation omitted).

[38] Plaintiff asserts that he should not have been disciplined because Gomez told him that he could not terminate the drivers. As Gomez explained, if Plaintiff terminated all his drivers then Defendant BakeMark would be out of the delivery business. (Doc. 66 at 49–50). In any event, there is no evidence that Phillips was aware of this interchange between Plaintiff and Gomez. Plaintiff also asserts that a jury could infer causation because Phillips would not allow Plaintiff to have GPS tracking devices on his trucks. No operations manager within BakeMark was allowed to unilaterally install GPS devices on trucks. (Doc. 93-2 at ¶ 15). Thus, Plaintiff was treated the same as his peers.

Plaintiff also contends that Defendant BakeMark's expectation that he work excessive hours (which necessitated additional leave) and demonstrates a causal connection between Plaintiff's protected activity and his eventual termination.   As to Plaintiff's hours in October and November 2011,  Plaintiff admits that  those months were Defendant BakeMark's busiest and that the Fairfield facility was down a warehouse supervisor during that time, which affected the workload of all warehouse workers—not just Plaintiff.  (Doc. 68 at 369, 428).[39]  As to Plaintiff's hours in April and May 2012, Plaintiff only offers any specifics for May 2, 2012, on which he worked 24 hours.[40] Plaintiff does not cite to any evidence that anyone from BakeMark made Plaintiff work these hours.  In fact, when Plaintiff told Weltzin he had worked that many hours, Weltzin told him to go home and get some rest.  (Doc. 62-1 at 501–02).  Further, hourly workers also had to work almost 20 hours that same day.  (*Id.* at 495–97, 503-06)  Thus, Plaintiff cannot claim that he was singled out and forced to work more because of his protected

---

[39] Plaintiff's wife testified that Plaintiff did <u>not</u> work excessive hours during this time. (Doc. 87 at 78-79, 96-97).  In any event, Plaintiff's doctor fully released him to work in October 2011 with no restrictions, and Plaintiff complained that his hours were excessive.  (Doc. 62-1 at 322–23; Doc. 63, Ex. J).

[40] As of March 30, 2012, Plaintiff had been fully released to work.  (Doc. 62-1 at 443–44). Plaintiff claims that he complained of "inhumane hours" to Gomez.  This complaint was made on April 3, 2012—only a few days after Plaintiff returned from leave.  (Doc. 66 at 100–02). Plaintiff does not present any evidence that he contacted human at any other time prior to May 3, 2012.  As to Plaintiff's claim "the harassment worsened," Plaintiff offers no facts (or even an example) of what he claims was "harassment."  (*See* Doc. 75-2.)  Plaintiff's subjective belief, without anything more, that he was "harassed" is not probative evidence.

activity.[41]

Here, Plaintiff was terminated by Defendant BakeMark only after the company gave him <u>nine months</u> of job-protected leave and only after he informed the company that he did not know if or when he would be able to return to work. (Doc. 62-1 at 151–52, 156; Doc. 62-29). Much of Plaintiff's purported evidence of retaliatory treatment is based on temporal proximity and his own subjective belief and speculation. This is not enough to survive Defendants' motion for summary judgment. *See Randolph*, 453 F.3d at 737; *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir.1996). While the burden of proof at the *prima facie* stage is minimal, Plaintiff has not provided evidence that enables the Court to find a causal connection between his protected activity and adverse employment actions. Accordingly, Plaintiff's *prima facie* case fails.

### 2.    Legitimate Non-Retaliatory Reasons

Even if Plaintiff could establish his *prima facie* case, Defendants have set forth legitimate non-retaliatory reasons for actions they took as to Plaintiff. As to the first disciplinary action, Defendants suggest that Witzel discovered issues in Plaintiff's department and that Weltzin issued a written counseling because of the severity of the issues and because Plaintiff had made false representations to Weltzin that some of the issues had been remedied. As to the second disciplinary action, Defendants suggest that Phillips exercised his business judgment in conducting an investigation into the

---

[41] *See McDonald v. Ford Motor Co*., 208 F.Supp.2d 837, 844–45 (N.D. Ohio 2002) (granting summary judgment in favor of the employer where the plaintiff failed to offer any evidence that any similarly-situated, non-disabled employees were treated more favorably).

complaint regarding DOT violations and disciplined Plaintiff based on the results of that investigation.

With respect to the hours Plaintiff worked in October and November 2011, Defendants suggest that those months were Defendant BakeMark's busiest and that the Fairfield facility was down a warehouse supervisor, which increased the workload of all employees. With respect to the hours Plaintiff worked in April and May 2012, Defendants suggest that business demands, unexpected injuries, and a resignation resulted in an increased workload for Plaintiff and his staff.[42]

### 3.      Pretext

To establish pretext, Plaintiff must show that the proffered reason: (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate that action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds*, *Geiger v. Tower Automotive,* 579 F.3d 614 (6th Cir. 2009). The Sixth Circuit has retreated from formulaic application of these categories and stresses that they serve only as a tool to assist in the court in addressing the ultimate inquiry: "did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009).[12]

Plaintiff does not advance a separate argument as to pretext. It is well settled that it is not within the purview of a court or a jury to second-guess business decisions, which are based upon a good faith, honest belief. *See Adams v. Tenn. Dep't of Finance and*

---

[42] Further, on May 2, 2012, there was an unexpected injury to a vendor that required immediate attention. (*See* Doc. 62-1 at 495–97, 503-06; Doc. 62-8 at 157-59).

*Admin.*, 179 Fed. App'x 266, 272 (6th Cir. 2006). For the reasons set forth in Section IV.C.1, *supra*, Plaintiff has not carried his burden to show that the reasons offered by Defendants were not its true reasons, but were a pretext for retaliation. Accordingly, for the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's claims for disability retaliation (Count Three).

### D. Punitive Damages (Count Twelve)[43]

To support a claim for punitive damages, the plaintiff must show that the employer 'engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Workman v. Frito-Lay, Inc.,* 165 F.3d 460, 469 (6th Cir.1999). "Malice" and "reckless indifference" refer to "the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999). Thus, to recover punitive damages, a plaintiff must prove that "an employer . . . discriminated in the face of a perceived risk that its actions will violate federal law[.]" *Id.* at 536.

Plaintiff argues that a jury could find malice based on the following: Justin Waters' admission that he was familiar with the ADA (and the requirement to provide reasonable accommodations) and was responsible for evaluating requests for accommodations; Weltzin's untruthful denial that he asked Plaintiff to postpone his leave; Defendant BakeMark employees' untruthful denials that the company had a policy

---

[43] Because the Court finds Defendants are entitled to summary judgment on all of Plaintiff's claims, it need not determine whether Plaintiff's damages are limited by alleged misconduct.

that prohibited employees from returning with restrictions; and Defendant BakeMark's untruthful representation that Plaintiff could not perform the essential functions of his position in 8 hours a day, 5 days a week. (Doc. 75 at 46).  Even taking the facts in the light most favorable to Plaintiff, there is no evidence that Defendants acted with a conscious disregard for the rights and safety of Plaintiff.  As set forth above, the evidence establishes that BakeMark attempted to engage in the interactive process with Plaintiff; afforded Plaintiff multiple reasonable accommodations; and made took any adverse employment actions for legitimate, non-retaliatory business reasons.  Accordingly,

Accordingly, for the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's claim for punitive damages (Count Twelve).

### V.    CONCLUSION

Accordingly, for the foregoing reasons:

1. Defendants' motion for summary judgment (Doc. 61) is **GRANTED**.

2. The Clerk shall enter judgment accordingly, whereupon this civil action is **CLOSED** in this Court.

**IT IS SO ORDERED.**

Date:  1/20/16                                    *s/ Timothy S. Black*
                                                 Timothy S. Black
                                                 United States District Judge